## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **TOOTIE PIE COMPANY, INC. D/B/A** | § | **Case No. 13-51808** |
| **TOOTIE GOURMET PIE CAFÉ** | § | |
| | § | |
| **Debtor** | § | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. SECTIONS 364 AND 503 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 4001 AUTHORIZING THE DEBTOR-IN-POSSESSION TO INCUR POST-PETITION FINANCING AND GRANTING LENDER AN UNSECURED ADMINISTRATIVE EXPENSE CLAIM AND REQUEST FOR HEARING**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**DEBTOR HAS REQUESTED EMERGENCY CONSIDERATION OF THIS MOTION AND HAS REQUESTED THAT A "FIRST DAY" HEARING BE HELD ON THIS MOTION AT THE COURT'S EARLIEST CONVENIENCE. IF THE COURT IN FACT SETS THIS MOTION FOR AN EMERGENCY "FIRST DAY" HEARING, THEN ONLY ATTENDANCE AT THE HEARING IS NECESSARY TO PRESERVE YOUR RIGHTS**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Tootie Pie Company, Inc. ("Debtor" or "Debtor-in-Possession"), the Debtor and Debtor-in-Possession in the above captioned case, hereby files this Motion for Entry of an Order Pursuant to 11 U.S.C. Sections 364 and 503 and Federal Rules of Bankruptcy Procedure 4001 Authorizing the Debtor-in-Possession to Incur Post-Petition Financing and Granting Lender an Unsecured Administrative Expense Claim and Request for Hearing (the "Motion") and in support of this Motion, the Debtor respectfully represents as follows:

## I.    PROCEDURAL BACKGROUND

1.    On July 3, 2013, (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Code") as a "small business" debtor.  The Debtor continues to manage and operate its financial affairs as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  No creditors' committee has yet been appointed in this case by the United States Trustee.  No trustee or examiner has been requested or appointed.

## II.    JURISDICTION AND VENUE

2.    This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.    FACTUAL BACKGROUND

### A.    Generally

3.    In 2005, In 2005, Tootie Pie Company, Inc. was formed and purchased certain assets from Ms. Ruby Lorraine "Tootie" Feagan, including all of her pie recipes, customer lists, the right to the "Tootie Pie" name, the related baking equipment, and a building located in Medina, Texas in exchange for $50,000 in cash and the issuance of 600,000 shares of common stock valued at $150,000, with the goal of maximizing the market and profitability of her pie recipes. The Company leased a 5,000 square foot building in Boerne, Texas where it manufactures its pies for broad-based distribution. This facility also serves as the corporate headquarters.  Debtor closed the original Medina location in 2006 which allowed it to focus all production and sales efforts out of our facility in Boerne.

4.      Debtor currently has 28 full and part time employees working at its cafes and in its pie factory.

5.      The company is cash flow positive for 6 months out of the year and 6 months of the year, the company is cash flow negative do the purchasing cycle of its products.  The company was unable to service its debt to TCA Global during the 6 months of negative cash flow and attempts at servicing the debt caused Debtor to fall behind on lease payments.  Through additional investment Debtor intends to increase its number of retail cafes thereby reducing its production overhead and increasing revues and profit margins.  Debtor's management believes that these factors combined with restructuring its debt will likely allow for a successful reorganization.

**B.      The Debt**

6.      Debtor has an unsecured debt in the amount of approximately $400,000 TCA Global, which was used for working capital.  The debt to TCA Global originally was supposed to be secured by all company assets but it appears to Debtor that TCA Global has not perfected its secured interest and is therefore unsecured.

7.      Debtor has additional unsecured debt to non insiders in the amount of approximately $300,000.

8.      The only other secured debts are landlord secured interests in Debtor's property in their respective café locations.

**C.      Lack of Liquidity**

9.      The retail pie industry in the US is very seasonal.  Because of this fact, revenue for Debtor's operation varies greatly throughout the year.  The Debtor generally operates at a small loss from February through June and then makes up for it from July through January.

Debtor anticipates this loss to fall somewhere between $25,000 and $50,000 between now and the end of August 2013. Therefore, Debtor is requesting the authority to incur debt in an amount up to $50,000 in the event such debt is necessary to maintain his hotel operations during this period of time.

## IV.    RELIEF REQUESTED

10.    Due to the potential lack of liquidity from now through August 2013, the Debtor is requesting authority to obtain Debtor In Possession financing from Dan Gostylo and Cliff Rogers with terms as stated herein.

11.    The DIP Credit Agreement contemplates the extension of a revolving credit facility ("RFC") on an unsecured basis to the Debtor, in an amount not to exceed $50,000. Dollars advanced pursuant to the RFC will bear interest at the non-default rate of 12% per annum. Furthermore, Debtor requests that after the entry of the Order, the RFC be an allowed administrative expense claim in the Chapter 11 Case.

12.    The Debtor respectfully requests authorization and approval from this Court to obtain this post-petition financing from Dan Gostylo and Cliff Rogers pursuant to 11 U.S.C. §§ 364(b) and 503(b); Fed. R. Bankr. P. 2002, 4001(c) and 9014; and Local Rules 4001 and 9014; and the DIP Credit Agreement attached as Exhibit A         .

13.    The DIP Credit Agreement and the material provisions therein constitute the entire understanding between Dan Gostylo and Cliff Rogers and the Debtor.

14.    By this Motion, the Debtor seeks entry of an Order approving the DIP Credit Agreement.

**A.    Debtor's Need for Post-petition Financing**

15.     The Debtor is currently unable to pay for employee wages coming due July 5, 2013.  Debtor believes if it does not make payroll on July 5, 2013, then its employees will not return to work and Debtors ability to reorganize will be impossible.

16.     Debtor now requests that this Court grant this Motion and allow the proposed DIP Credit agreement to facilitate the continued operation of the Debtor, including, but not limited to: reasonable compensation and expenses incurred by the lawyers and professionals of the Debtor; payment of operating expenses, taxes and miscellaneous costs of the Debtor; payment of employee obligations of the Debtor; and payment to the Office of the United States Trustee for incurred fees.

17.     The proposed financing is critical to preserving and enhancing Debtor's abilities to operate as a going concern.  As such, the credit offered by Dan Gostylo and Cliff Rogers is allowable under section 364(b) and 503(b) of the Bankruptcy Code as an administrative expense. Debtor is unable to obtain the financing on terms competitive with, let alone, more favorable than, the financing currently offered by Dan Gostylo and Cliff Rogers.

18.     Dan Gostylo and Cliff Rogers are both shareholders and directors of Debtor.

19.     Debtor believes that the DIP Credit Agreement and the material provisions set forth therein are fair, just and reasonable under the circumstances, ordinary and appropriate for financing for a debtor-in-possession in similar high-risk situations; that the DIP Credit Agreement and material provisions reflect the debtor's exercise of prudent business judgment consistent with its fiduciary duties, and that the terms of the DIP Credit Agreement are supported by reasonably equivalent value and fair consideration.

20.     The terms and conditions of the DIP Credit Agreement and the material provisions set forth therein have been negotiated in good faith and were entered into under the parties' own free will and with complete authority.

21.     Debtor believes that the relief requested in this Application is necessary, essential and appropriate and is in the best interest of and will benefit Debtor, his creditors and the estate. Implementation of the DIP Credit Agreement will, among other things, provide Debtor with the necessary liquidity to (a) minimize disruption to the Debtor's business and on-going operations; (b) preserve and maximize the value of the Debtor's estate for the benefit of all of the creditors; and (c) avoid immediate and irreparable harm to Debtor and his creditors, business and assets.

## V.     Argument and Authority

22.     Pursuant to 11 U.S.C. § 364(b), "the court, after notice and a hearing, may authorize the [debtor-in-possession] to obtain unsecured credit or to incur unsecured debt . . . allowable under section 503(b)(1) of this title as and administrative expense."  Here, the Debtor has located unsecured credit to pay "the actual, necessary costs and expenses of preserving the estate," and is therefore entitled to the relief requested.  11 U.S.C. § 503(b)(1)(A).

23.     "Cases consistently reflect that the court's discretion under section 364 of the Bankruptcy Code is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as to benefit the parties in interest."  See *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (S.D.N.Y. 1990).  Here, the Debtor has used its reasonable business judgment in its determination to obtain credit pursuant to the DIP Credit Agreement, which will permit the debtor to continue operating its business as a going concern, while attempting to reorganize to realize value for its creditors.  In no way is the

bankruptcy process being leveraged as this DIP Credit Agreement will form the basis for recovery to the Debtor's estate.  The alternative to the Debtor is a Chapter 7 liquidation, which will potentially leave the estate without any recovery.

24.     For all of the above reasons, this Court should grant the Debtor's Motion.

## VI.     SET THE MOTION FOR FINAL HEARING

25.     Bankruptcy Rule 4001(c)(2) states, ". . . the court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion." Here the debtor has requested interim relief and asked the Court Grant Such relief.  Debtor additionally, requests the Court set a final hearing with respect to the instant motion, no earlier than fourteen (14) days after notice has been sent to required parties.  Therefore, Debtor requests the Court set a final hearing on Debtors' motion 14 days after notice has been sent to the required parties.

WHEREFORE, Debtor respectfully requests that Debtor be permitted to obtain immediate to avoid irreparable hard and upon final hearing the Court grant additional relief requested herein and enter an Order Authorizing Debtor-in-Possession to Obtain Post-Petition Financing.

Dated: July 3, 2013

Respectfully submitted,


By:    /s/ Ronald J. Smeberg             
            RONALD J. SMEBERG
            State Bar No. 24033967

THE SMEBERG LAW FIRM, PLLC
11550 IH 10 West, Suite 180
San Antonio, Texas 78230
210-695-6684 (Tel)
281-754-4042 (Fax)
ron@smeberg.com
ATTORNEY FOR DEBTOR

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **TOOTIE PIE COMPANY, INC. D/B/A** | § | **Case No. 13-** |
| **TOOTIE GOURMET PIE CAFÉ** | § | |
| | § | |
| **Debtor** | § | |

**ORDER GRANTING DEBTOR'S AMENDED MOTION PURSUANT TO 11
U.S.C. SECTIONS 364 AND 503 AND FEDERAL RULES OF BANKRUPTCY
PROCEDURE 4001 AUTHORIZING THE DEBTOR-IN-POSSESSION TO INCUR
POST-PETITION FINANCING AND GRANTING LENDER AN UNSECURED
<u>ADMINISTRATIVE EXPENSE CLAIM AND REQUEST FOR HEARING</u>**

This matter came before the Court on Tootie Pie Company, Inc. ("Debtor"), Debtor-in-

Possession, Motion Pursuant to 11 U.S.C. Sections 364 and 503 and Federal Rules of

Bankruptcy Procedure 4001 Authorizing the Debtor-in-Possession to Incur Post-Petition

Financing and Granting Lender an Unsecured Administrative Expense Claim (the "Motion"); the

Court having reviewed the papers in support of the Application; the Court having reviewed the

Debtor-in-Possession (the "DIP Credit Agreement") as between Debtor and DAN GOSTYLO AND

CLIFF ROGERS; the Court having heard the arguments of counsel at the hearing of this matter; and

good cause appearing,

1

**THE COURT HEREBY FINDS AS FOLLOWS:**

1.      At this time the Debtor has no ability to fund the administration of this bankruptcy matter for the months of July and August 2013 other than to obtain debtor-in-possession, post-petition financing on an unsecured, administrative-priority basis, pursuant to 11 U.S.C. §§ 364(b) and 503(b).

2.      Due to the lack of liquidity available to the Debtor, it was contemplated, and by the Debtor's Motion was requested, permission to obtain credit from DAN GOSTYLO AND CLIFF ROGERS pursuant to the DIP Credit Agreement.

3.      The DIP Credit Agreement contemplates the extension of revolving credit facility on an unsecured, administrative priority basis to the Debtor, in an amount not to exceed $50,000.

4.      Dollars advanced pursuant to the DIP Credit Agreement will bear interest at the non-default rate of 12% per annum.

5.      The proposed financing is critical to preserving and enhancing Debtor's abilities to operate as a going concern.

6.      As stated in the Motion, Debtor is unable to obtain financing on terms competitive with or more favorable than the financing currently offered by DAN GOSTYLO AND CLIFF ROGERS therefore relief under 11 U.S.C. §364(b) is appropriate.

7.      The Debtor has provided adequate and sufficient notice of the hearing on Debtor's Motion, by providing notice to:  (i) the prepetition lenders; (ii) the post-petition lender, DAN GOSTYLO AND CLIFF ROGERS; (iii) the creditors identified on the list of creditors holding the 20 largest unsecured claims against the Debtor; (iv) the office of the United States Trustee; (v) all known creditors, lienholders, stakeholders, any party that has filed a notice with the Bankruptcy

Court prior to this Motion being filed, and all other parties in interest. Such notice is appropriate, adequate and proper under the circumstances.

**BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

8.      The Debtor is authorized to obtain post-petition financing pursuant to the DIP Credit Agreement, which is attached to this order as Exhibit A, with DAN GOSTYLO AND CLIFF ROGERS via an extension of a revolving credit facility on an unsecured, administrative priority basis to the Debtor in an amount no to exceed $50,000.

9.      Dollars advanced pursuant to the DIP Credit Agreement will bear interest at the non-default rate of 12% per annum.

10.      After the entry of this Order, the dollars advanced pursuant to the DIP Agreement will constitute an allowed Chapter 11 administrative expense claim in the Case, having priority over all prepetition unsecured claims against the Debtor now existing or hereafter arising, of any kind whatsoever.

11.      Within five (5) business days of receiving a financing disbursement from the revolving credit facility, Debtor shall provide notice to the United States Trustee of the amount of financing received and the total amount of financing outstanding.

###

Submitted by:

By:     /s/ Ronald J. Smeberg                                             .
RONALD J. SMEBERG
    State Bar No. 24033967
SMEBERG LAW FIRM, PLLC
11550 IH 10 West, Suite 180
San Antonio, Texas 78230
210-695-6684 (Tel)
281-754-4042 (Fax)
ron@smeberg.com
ATTORNEY FOR DEBTOR

3

**EXHIBIT A**

DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT

Dated as of JULY _____, 2013

among

TOOTIE PIE COMPANY, INC.

Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, as Borrower,

DAN GOSTYLO AND CLIFF ROGERS

as Lender

Table of Contents

RECITALS ...................................................................................................................... 4

ARTICLE I DEFINITIONS ........................................................................................... 4

    1.1    Defined Terms. ............................................................................................... 4

    1.2    Other Definitional Provisions ....................................................................... 8

    1.3    Payment Terms; References to Money .......................................................... 9

ARTICLE II AMOUNT AND TERMS OF REVOLVING LOANS ............................ 9

    2.1    Revolving Loan Commitments. ..................................................................... 9

    2.2    Revolving Notes .......................................................................................... 10

    2.3    Procedure for Revolving Loans and Payments ........................................... 10

    2.4    Permanent Reduction of Revolving Loan Commitment .............................. 10

    2.5    Interest Rates and Payment Dates. .............................................................. 11

    2.6    Computation of Interest ............................................................................... 11

    2.7    Prepayments ................................................................................................. 11

    2.8    Use of Proceeds ........................................................................................... 12

    2.9    Separate Loans Not to Exceed Commitment ............................................... 12

    2.10    Unsecured Administrative Expense ............................................................. 12

    2.11    Payment of Obligations ............................................................................... 12

    2.12    No Discharge, Survival of Claims ............................................................... 13

ARTICLE III REPRESENTATIONS AND WARRANTIES ...................................... 13

    3.1    No Legal Bar ................................................................................................ 13

    3.2    No Material Litigation.................................................................................. 13

    3.3    No Default .................................................................................................... 13

    3.4    Purpose of Loans ......................................................................................... 14

    3.5    Accuracy and Completeness of Information ............................................... 14

    3.6    The Order ..................................................................................................... 14

    3.7    Priority of Claims ........................................................................................ 14

    3.8    Reorganization Matters ............................................................................... 14

ARTICLE IV CONDITIONS PRECEDENT ............................................................... 15

    4.1    Conditions to Additional Loans upon entry of the Final Order ................... 15

ARTICLE V NEGATIVE COVENANTS .................................................................... 16

5.1     Limitation on Indebtedness ........................................................................... 16

5.2     Limitation on Liens ..................................................................................... 16

5.3     Limitation on Sale of Assets ........................................................................ 16

ARTICLE VI TERMINATION ..................................................................................... 17

6.1     Termination ................................................................................................. 17

ARTICLE VII EVENTS OF DEFAULT; RIGHTS AND REMEDIES ..................................... 17

7.1     Events of Default ......................................................................................... 17

7.2     Remedies ..................................................................................................... 19

ARTICLE VIII MISCELLANEOUS ................................................................................ 20

8.1     Amendments and Waivers ............................................................................ 20

8.2     No Waiver; Cumulative Remedies ................................................................ 20

8.3     Survival of Representations and Warranties .................................................. 20

8.4     Successors and Assigns; Participations and Assignments ............................... 20

8.5     Counterparts ................................................................................................ 20

8.6     Severability ................................................................................................. 21

8.7     Governing Law ............................................................................................ 21

8.8     No Waiver ................................................................................................... 22

8.9     Waiver of Claims ......................................................................................... 22

PROMISSORY NOTE ................................................................................................ 24

THIS DEBTOR-IN-POSSESSION REVOLVING CREDIT AND GUARANTY AGREEMENT, dated as of July _____, 2013, between TOOTIE PIE COMPANY, INC.("Borrower"), debtor and a debtor-in-possession in a case pending under Chapter 11 of Title 11 of the Bankruptcy Code (as defined in <u>Section 1.1</u> (the "Chapter 11 Case")), and DAN GOSTYLO AND CLIFF ROGERS ("Lender").

RECITALS

WHEREAS, on July 3, 2013 (the "Petition Date"), the Borrower filed a voluntary petition with the Bankruptcy Court (as defined in <u>Section 1.1</u>) initiating the Chapter 11 Case and has continued in the possession of its assets and in the management of its business pursuant to Bankruptcy Code Sections 1107 and 1108;

WHEREAS, an immediate and on-going need exists for the Borrower to obtain additional funds in order to continue the operation of its business as debtor-in-possession under Chapter 11 of the Bankruptcy Code and, accordingly, the Borrower has requested that the Lender extend post-petition financing to the Borrower;

WHEREAS, the Lender is willing to make the Revolving Loan (as defined in Section 1.1) to the Borrower upon the terms and conditions set forth herein;

WHEREAS, all Exhibits hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together, shall constitute but a single agreement.

THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

ARTICLE I DEFINITIONS

1.1    <u>Defined Terms</u>.

Capitalized terms used in the Loan Documents shall have (unless otherwise provided elsewhere in the Loan Documents) the following respective meanings and all Section references in the following definitions shall refer to Sections of the Agreement.

"Agreement" shall mean this Debtor-in-Possession Revolving Credit Agreement, as the same may from time to time be amended, modified or supplemented.

"Asset Sale" shall mean any disposition of Collateral or series of related dispositions of Collateral.

"Bankruptcy Code" shall mean 11 U.S.C. §§ 101, et seq. as amended.

4

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Western District of Texas.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Case.

"Borrower" shall mean and refer to TOOTIE PIE COMPANY, INC..

"Borrowing Availability" means, at any time, (a) the aggregate amount of the Maximum Commitment Amount at such time, less (b) the Carve-Out, less 9c) the then total utilization of Revolving Loan Commitments.

"Business Day" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in Texas are authorized or required by law to close.

"Change of Control" shall mean the occurrence of any of the following:

(a) the acquisition directly or indirectly by any Person, or two or more Person acting in concert (other than the Lenders) of (i) beneficial ownership (within the meaning of Rule 13d-3 of the Securities and Exchange Commission under the Securities Exchange Act of 1934) of thirty-five percent (35%) of the outstanding Voting Securities of the Parent or (ii) the power (whether or not exercised) to elect a majority of the Parent's directors;

(b) Borrower's Chapter 11 Case shall be converted or dismissed.

"Chapter 11 Case" shall have the meaning ascribed thereto in the Preamble.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Commitment Termination Date" shall mean the earliest of (a) the maturity date, (b) the date that is thirty (30) days after entry of the Order by the Bankruptcy Court, (c) the date of substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court, and (d) the acceleration of the Revolving Loans and the termination of the Revolving Loan Commitments in accordance with the terms hereof, including Section 7.2.

"Default" shall mean any of the events specified in Section 7.1, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

5

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Event of Default" shall have the meaning ascribed thereto in <u>Section 7.1</u>.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court which order shall be satisfactory in form and substance to Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely field, such appeal or motion to reconsider has been dismissed or denied (unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur indebtedness, provides for the administrative expense status of Lender's claims.

"Fiscal Year" shall mean any of the annual accounting periods of the Borrower ending on December 31 of each year.

"Interest Payment Date" means the first Business Day of each month.

"Interim Closing Date" shall mean July_____, 2013.

"IRS" shall mean the Internal Revenue Service, or any successor thereto.

"Lender" shall have the meaning ascribed thereto in the preamble.

"Lien" shall mean (any mortgage, pledge, statutory deemed trust, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC (other than the filing of any such financing statement which states therein that such filing is a precautionary filing only and is filed in connection with "true leases" only) or comparable law of any jurisdiction), (b) any arrangement or agreement which prohibits any loan party from creating any mortgage, pledge, hypothecation, deposit arrangement, encumbrance, lien, charge or other security interest, or from entering into any agreement or arrangement described in <u>clause (a)</u> of this definition or (c) the sale, assignment, pledge or transfer for security of any accounts, general intangibles or chattel paper of any loan party with or without recourse.

"Litigation" shall have the meaning ascribed thereto in <u>Section 3.4</u>.

"Loans" shall mean the Revolving Loans.

6

"Loan Documents" shall mean the Agreement, the Revolving Notes and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of Borrower in connection with the Agreement or the transactions contemplated hereby. Any reference in the Agreement or any other Loan Document to a Loan Document shall include all exhibits thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such Agreement as the same may be in effect at any and all times such reference becomes operative.

"Material Adverse Effect" shall mean a material adverse effect on (a) the business, operations, property, or condition (financial or otherwise) of the Borrower, (b) the ability of Borrower to fully and timely perform its Obligations or (c) the validity, priority or enforceability of this Agreement, any of the Revolving Notes or any of the other Loan Documents, or the rights or remedies of the lenders hereunder or thereunder.

"Maturity Date" shall mean January 31, 2014.

"Maximum Commitment Amount" shall mean $50,000.

"Notes" shall mean the Revolving Notes.

"Obligations" shall mean the unpaid principal of and interest on (including without limitation, interest accruing after the maturity of the Revolving Loans) the Revolving Notes and under this Agreement, or any other document made, delivered or given in connection therewith or herewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, or expenses.

"Person" shall mean an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unicorporated association, joint venture, governmental authority or other entity of whatever nature.

"Petition Date" shall have the meaning ascribed thereto in the Recitals.

"Post-petition Financing Order" shall mean the Final Order.

"Reimbursement Date" shall have the meaning ascribed to it in Section 2.4.

"Reorganization Plan" shall mean a plan of reorganization or liquidation filed by the Borrower in the Chapter 11 Case.

"Requirement of Law" as to any Person shall mean the certificate of incorporation and bylaws or other organization or governing documents of such Person, and any law, treaty, rule or

regulation or determination of an arbitrator or a court or other governmental authority, in each case, applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Revolving Loan" shall have the meaning ascribed thereto in Section 2.1, as such Revolving Loans may be increased by interest and Fees capitalized and added to the principal balance thereto pursuant to the terms of this Agreement.

"Revolving Loan Commitment" means Lender's commitment to make Revolving Loans to the Borrower as set forth herein.

"Revolving Note" shall have the meaning ascribed thereto in Section 2.2.

"Total Utilization of Revolving Loan Commitments" means, as at any date of determination, the sum of the aggregate principal amount of all outstanding Revolving Loans including interest and Fees that are capitalized and added to the principal balance of the Revolving Loans pursuant to the terms of this Agreement.

1.2     Other Definitional Provisions

(a)     Unless otherwise specified therein, all terms defined in this Agreement shall have their respective defined meanings when used in the Notes or other documents made or delivered pursuant hereto.

(b)     As used herein, in the Notes or other documents made or delivered pursuant hereto, accounting terms relating to either Borrower and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under normal and customary use.

(c)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole, including all Exhibits, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection or clause contained in the Agreement or any such Exhibit.  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(d)     Unless the context otherwise requires, each reference herein to any agreement, document or instrument (including the Loan Documents) shall be deemed a reference to such agreement, document or instrument as amended, restated, supplemented or otherwise modified from time to time.

(e)     The term "includes" and "including" shall not be construed to imply any limitation.

(f)     In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding".  Periods of days referred to in this Agreement shall be counted in calendar days unless Business days are expressly prescribed.  Any period determined hereunder by reference to a month or months or year or years shall end on the day in the relevant calendar month in the relevant year, if applicable, immediately preceding the date numerically corresponding to the first day of such period, provided that if such period commences on the last day of a calendar moth (or on a day for which there is no numerically corresponding day in the calendar month during which such period is to end), such period shall, unless otherwise expressly required by the other provisions of this Agreement, end on the last day of the calendar month.

1.3     Payment Terms; References to Money

Except as expressly set forth herein to the contrary, (a) all payments made by the Borrower shall be mad in Dollars in respect of principal and interest on the Revolving Loans, and (b) to the extent not otherwise indicated, all amounts of money referenced herein shall mean and be references to amounts of money denominated in Dollars.

ARTICLE II AMOUNT AND TERMS OF
REVOLVING LOANS

2.1     Revolving Loan Commitments.

Subject to the terms and conditions hereof (including without limitation the conditions precedent set forth in ARTICLE IV hereof),

Lender severally agrees to make Revolving Loans (each, a "Revolving Loan") to Borrower from time to time until the Commitment Termination Date in an aggregate principal amount at any one time outstanding not to exceed the Borrowing Availability; provided that Lender shall not be permitted or required to make any Revolving Loan if:

(a)     After giving effect thereto, the sum of the outstanding aggregate principal amount of Revolving Loan would exceed Lender's Revolving Loan Commitment; or

9

(b)     After giving effect thereto, the aggregate outstanding principal amount of Revolving Loan outstanding would exceed the Borrowing Availability.

Until the Commitment Termination Date, the Borrower may from time to time borrow, prepay the Revolving Loans in whole or in part, and re-borrow under this Section 2.1, all in accordance with the terms and conditions hereof (subject in particular to any reductions in Revolving Loan commitments pursuant to Sections 2.4 and 0) and in accordance with the applicable Budget.  Each Revolving Loan shall be denominated in Dollars.

2.2     Revolving Notes

The Revolving Loan made by Lender shall be evidenced by a promissory note of the Borrower made to the order of Lender substantially in the form of __Exhibit A__ (a "Revolving Note"), with appropriate insertions as to date and principal amount, payable to the order of Lender and in a principal amount equal to the lesser of (a) the amount of the Revolving Loan commitment and (b) the aggregate unpaid principal amount of all Revolving Loans made by Lender.  Each Revolving Note shall (i) be dated the Interim Closing Date, (ii) be stated to mature on the Maturity Date or such earlier date the Revolving Loans shall be due and payable in full, whether by acceleration or otherwise, pursuant to the terms of this Agreement and (iii) provide for the payment of interest.

2.3     Procedure for Revolving Loans and Payments

(a)     The Borrower may borrow under the Revolving Loan Commitments until the Commitment Termination Date on any Business Day, provided that (i) the Borrower may not make more than one borrowing per calendar week.  Each borrowing under the Revolving Loan Commitment shall be in an amount equal to not less than $2,000 or a whole multiple of $2,000 in excess thereof.  Prior to 2:00 p.m. Texas time on the Borrowing Date requested by the Borrower, Lender will make the amount of the Revolving Loan available to the account of the Borrower.

(b)     The Revolving Loan (including all interest and fees capitalized and added to the principal balance of the Revolving Loan) shall be paid in full on the Commitment Termination Date, pursuant to the terms herein.  Lender's Obligation to make Revolving Loan shall terminate at the close of business on the Business Day immediately preceding the Maturity Date, unless sooner terminated in accordance with the terms hereof.

2.4     Permanent Reduction of Revolving Loan Commitment

The Borrower shall have the right, upon not less than five Business Days' notice, to terminate the Revolving Loan Commitment or, from time to time, to reduce permanently the amount of the Revolving Loan Commitment in whole, but not in part.  Such reduction of the Revolving Loan Commitment shall be accompanied by payment in full of all outstanding

principal and accrued interest thereon, to and including the date of such prepayment, together with any additional amounts owing and any outstanding fees and expenses due and owing.

2.5     Interest Rates and Payment Dates.

(a)     Each Revolving Loan (and all amounts capitalized and added to the principal balance of the Revolving Loans) shall bear interest at a rate *per annum* of seven per cent (12.0%).

(b)     Notwithstanding the foregoing, in the event an Event of Default has occurred and is continuing, the Revolving Loan shall bear interest at a rate *per annum* equal to the rate set forth above plus 1.0% from the date of occurrence of such event of Default until date such Event of Default is cured or waived (after as well as before judgment).  In addition, should any interest on Revolving Loan or any other obligations payable hereunder not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest (to the extent permitted by law in the case of interest on interest) at a rate *per annum* equal to the rate set forth above plus 1.0%, in each case, from the date of such non-payment until such amount is paid in full (after as well as before judgment).

(c)     Accrued interest on the revolving Loan will be capitalized and added to the outstanding principal balance of the Revolving Loan as of each Interest Payment Date.  Amounts representing interest which are capitalized and added to the outstanding principal balance of Revolving Loan, shall thereafter bear interest in accordance with this Section and otherwise be treated as a Revolving Loan for all purposes of this Agreement (except for purposes of determining the Total Utilization of Revolving Loan Commitments).  Interest accruing pursuant to Section 2.5(b) shall be payable from time to time on demand.

2.6     Computation of Interest

(a)     Interest shall be calculated for the actual number of days elapsed on the basis of a hypothetical year of 360 days.

(b)     Each determination of an interest rate pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lender in the absence of manifest error.

2.7     Prepayments

(a)     Optional Prepayments.  Borrower may, at any time and from time to time prepay the Revolving Loans, in whole or in part, without premium or penalty, upon irrevocable written notice to the Lender by 11:00 a.m. (Texas time) on such date of prepayment, in each case specifying the dae and amount of prepayment.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with any amounts

payable, accrued interest to such date on the amount prepaid and any outstanding fees and expenses then due and owing.

      (b)    Mandatory Prepayments.

      (i)    If at any time the Total Utilization of the Revolving Loan Commitments exceeds the Maximum Commitment Amount, Borrower shall repay the aggregate outstanding Revolving Loan to the extent required to eliminate such excess.

## 2.8    Use of Proceeds

The Borrower shall utilize the proceeds of the Revolving Loan solely (a) to pay post-petition expenses.  Borrower shall not be permitted to use the proceeds of the Loans:  (i) to finance in any way, any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of Lender or its rights and remedies under this Agreement, the other Loan Documents, the Final Order, (i) to finance the payment of, or application for authority to pay, any prepetition claim (other than Property Taxes without the Lender's prior written consent, (iii) to make any distribution under a Reorganization Plan in any Chapter 11 Case, (iv) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of Lender.

## 2.9    Separate Loans Not to Exceed Commitment

All Loans to the Borrower and all of the other Obligations of Borrower arising under this Agreement and the other Loan Documents shall constitute separate loans to the Borrower, evidence by a separate promissory note executed by the Borrower, provided, however, that the total outstanding balance of all loans by Borrower shall not exceed the Commitment amount.

## 2.10    Unsecured Administrative Expense

Borrower hereby covenants, represents and warrants that, upon entry of the Final Order, the Obligations of the Borrower hereunder and under the Loan Documents:  (i) pursuant to Section 364(b) of the Bankruptcy Code, shall at all times constitute allowed administrative expense claims in the Chapter 11 Cases having priority over unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever.

## 2.11    Payment of Obligations

Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

2.12    No Discharge, Survival of Claims

Borrower agrees that to the extent the Obligations hereunder are not satisfied in full, (i) its Obligations arising hereunder shall not be discharged by the entry of an order confirming a Reorganization Plan (and the Borrower pursuant to Section 1141(d)(4) of the Bankruptcy Code hereby waives any such discharge) and (ii) the unsecured administrative expense claim granted to Lender pursuant to the Final Order shall not be affected in any manner by the entry of an order confirming a Reorganization Plan in any Chapter 11 Case.

ARTICLE III REPRESENTATIONS
AND WARRANTIES

To induce Lender to make the Loans, the Borrower makes the following representations and warranties to Lender with respect to Borrower, each and all of which shall survive the execution and delivery of this Agreement.

3.1    No Legal Bar

Except for the effect of the filing of the Chapter 11 Case, the execution, delivery and performance of the Loan Documents to which Borrower is a party, the borrowings by each Borrower hereunder and the use of the proceeds thereof (a) will not violate any Requirement of Law or Contractual Obligation of Borrower, (b) will not accelerate or result in the acceleration of any payment obligations of Borrower, and (c) will not result in, or require, the creation or imposition of any Lien on any of the respective properties or revenues of any Borrower pursuant to any such Requirement of Law or Contractual Obligation.

3.2    No Material Litigation

No litigation, investigation or proceeding of or before any arbitrator or governmental authority (collectively, "Litigation") is pending or, to the knowledge of Borrower, threatened by or against Borrower (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) which could reasonably be expected to have a Material Adverse Effect.

3.3    No Default

Borrower is not in default under, or with respect to, any of its Contractual Obligations in any respect which could reasonably be expected to have a Material Adverse Effect.  Immediately after giving effect to this Agreement, no Default or Event of Default has occurred and is continuing.

3.4     Purpose of Loans

The Borrower shall not use the proceeds of any Revolving Loan hereunder (a) other than in accordance with this Agreement.

3.5     Accuracy and Completeness of Information

All information, reports and other papers and data with respect to the Borrower (other than projections) furnished to the Lender by or on behalf of Borrower, were, at the time furnished, complete and correct in all material respects, or have been subsequently supplemented by other information, reports or other papers or data, to the extent necessary to give the Lender a true and accurate knowledge of the subject matter in all material respects. There is no fact known to any Loan Party which has, or could reasonably be expected to have, a Material Adverse Effect.

3.6     The Order

On the date of the making of any Revolving Loan, the Final Order shall have been entered and shall not have been amended, stayed, vacated or rescinded without the Lender's consent. Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations of the Borrower hereunder and under the other Loan Documents, the Lender shall be entitled to immediate payment of such obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

3.7     Priority of Claims

Upon the entry of the Final Order, the unsecured Administrative Expense Claim status shall be as set forth herein.

3.8     Reorganization Matters

(a)     The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for the hearing for the approval of the Order has been given.

(b)     After the entry of the Order, and pursuant to and to the extent permitted in the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all unsecured claims against Borrower now existing or hereafter arising, of any kind whatsoever.

(c)     The Final Order (with respect to the period on and after entry of the Final Order) is in full force and effect has not been reversed, stayed, modified or amended.

14

(d)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Lender shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

## ARTICLE IV CONDITIONS
## PRECEDENT

4.1     Conditions to Additional Loans upon entry of the Final Order

The obligations of the Lenders to make the initial and any additional Revolving Loans in an amount not to exceed the Maximum Commitment Amount on the Closing Date, or to take, fulfill, or perform any other action hereunder, until the following conditions has been satisfied or provided for in a manner satisfactory to the Lender, or waived in writing by the Lender:

(a)     Loan Documents.     The Lender shall have received this Agreement, the Revolving Note and all other Loan Documents, each other agreement, documents and instruments relating to the loan and other credit transactions contemplated by this Agreement, each duly executed where appropriate and in form and substance satisfactory to the Lender.

(b)     No Material Adverse Effect.  No Material Adverse Effect shall have occurred with respect to Borrower, other than those which customarily occur as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Cases.

(b)     Final Order.   In no later than thirty (30) days after the Closing Date, Lender shall have received a copy of the Final Order, inter alia, approving the transactions contemplated hereby and finding that the Lender is extending credit to the Borrower in good faith within the meaning of section 364(e) of the Bankruptcy Code.  Such Final Order (i) shall be in form and substance satisfactory to Lender, (ii) shall have been entered upon an application of the Borrower reasonably satisfactory in form and substance to the Lender, (iii) shall be in full force and effect and (iv) shall not has been stayed, reversed, vacated or rescinded or, without the consent of the Lender, modified or amended in any respect and, if the Final Order is the subject of a pending appeal in any respect, neither the making of such Loans nor the performance by the Borrower or any of its Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(d)     Litigation.  No litigation shall have been commenced or be pending which has not been stayed by the commencement of the Chapter 11 Cases and which, if successful, would have a Material Adverse Effect on Borrower taken as a whole, their business or ability to repay the Revolving Loans or which would challenge this Agreement, Post-petition Financing Orders or the transaction contemplated thereby.

## ARTICLE V NEGATIVE COVENANTS

From the date hereof and for so long as the Revolving Loan Commitments remain in effect, any Revolving Note remains outstanding and unpaid or any Obligation is owing to the Lender hereunder, Borrower hereby agrees that it will not, (and will not apply, unless in connection with an amendment to the Agreement that is reasonably likely to be approved by the Lender to the Bankruptcy Court for authority to):

5.1     Limitation on Indebtedness

Create, incur, assume or permit to exist any Indebtedness, or enter into any agreement or binding commitment to create, incur, assume or suffer to exist any Indebtedness, except:

(a) the Revolving Loans and the other Obligations created under this Agreement;

5.2     Limitation on Liens

Create, incur, assume or permit to exist any Lien on or with respect to its Accounts or any of its other properties, assets or revenues, (whether now owned or hereafter acquired), except for the "Permitted Encumbrances":

(a)     inchoate Liens for taxes, assessments or governmental charges or levies or Liens for taxes, assessments, governmental charges or levies not yet due or which are being contested in good faith by appropriate proceedings; *provided* that adequate reserves with respect thereto are maintained on the books of the Borrower;

5.3     Limitation on Sale of Assets

Convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets (including, without limitation, any Capital Stock, receivables and fee or leasehold interests), whether now owned or hereafter acquired, in each case, in one transaction or a series of transactions to any Person, except:

(a)     as otherwise approved in writing prior to the consummation thereof by Lender; and

(b)     the sale or other disposition of obsolete or worn out property in the ordinary course of business and having a book value not exceeding $10,000 in the aggregate in any Fiscal Year, provided that the Net Disposition Proceeds of each transaction (if any) are applied in prepayment of the Revolving Loans.

Incur, create, assume, suffer to exist or permit any other Superpriority Claim or Lien which is _pari passu_ with or senior to the claims of the Lender granted pursuant to this Agreement and the Post-petition Financing Orders.

ARTICLE VI

TERMINATION

6.1     Termination

The financing arrangements contemplated hereby shall be in effect until the Commitment Termination Date, and the Loans and all other Obligations shall be automatically due and payable in full on such date.

6.2     Survival of Obligations Upon Termination of Financing Arrangements. Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement  shall  in any way affect or impair the obligations, duties and liabilities of the Borrower or the rights of Lender relating to any unpaid portion of the Loans or any other Obligations, due or not due, liquidated, contingent or unliquidated or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Commitment Termination Date.

Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon the Borrower, and all rights of Lender, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Commitment Termination Date.

ARTICLE VII EVENTS OF DEFAULT;

RIGHTS AND REMEDIES

7.1     Events of Default

Notwithstanding the provisions of section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court or any notice to Borrower, and subject to Section 7.2, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)     (i) Borrower shall fail to pay any principal of any Revolving Note when due in accordance with the terms thereof or hereof or (ii) Borrowers shall fail to pay any interest on any Revolving Note, any other Obligation or any other amount payable hereunder, within five days after any such interest or other amount becomes due in accordance with the terms thereof or hereof; or

17

(b)     One or more judgments or decrees shall be entered after the Petition Date against the Borrower involving in the aggregate a liability (to the extent not covered by third- party insurance as to which the insurer has acknowledged coverage) of $10,000 or more, net of insurance proceeds, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

(c)     The occurrence of any additional "Event of Default" identified in the Interim Order (or, when applicable, analogous paragraph of the Final Order) not identified herein; or

(d)     The occurrence of any of the following in the Chapter 11 Case:

(i)     the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of any of the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise;

(ii)     the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of any of the Borrower (powers beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code);

(iii)     the entry of an order of competent jurisdiction (1) reversing, staying, vacating or rescinding the Final Order, or otherwise ceases to be in full force and effect or (2) amending, supplementing or otherwise modifying the Interim Order or the Final Order without the written consent of the Lender or the filing of a motion for reconsideration in respect of the total Revolving Loan Commitments, without Lender's consent;

(iv)     Borrower materially violates or breaches the post-petition Financing Orders or file any pleadings seeking, joining in, or otherwise consenting to any material violation or breach of the Post-petition Financing Orders;

(v)     the bringing of a motion, taking of any action or the filing of any Reorganization Plan or disclosure statement attendant thereto by any of the Borrower in the Chapter 11 Cases:     (1) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (2) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; or (3) any other action or actions adverse to Lender's rights and remedies hereunder;

(vi)     the entry of an order in any of the Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to the Lender;

(vii)     the Final Order is not entered within 30 days following the hearing;

18

(viii)   the entry of an order in any of the Chapter 11 Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement;

\

(ix)   the Bankruptcy Court shall enter an order or orders granting relief from or modifying the automatic stay applicable under Section 362 of the Bankruptcy Code to permit one or more creditors to execute upon, enforce or perfect a lien on any assets of the Borrower;

(x)   Commencement of any suit against the Lender that would in any way reduce, set off, or subordinate the Obligations under this Agreement; if any such suit is commenced by any party other than the Borrowers, and in the reasonable  judgment  of  the Lender, such suit has a reasonable possibility of success, and if successful, would be reasonably likely to have a material adverse effect on (1) the Borrowers or (2) Borrower's business or his ability to repay the Revolving Loans made under this Agreement;

(xi)   the payment of, or application for authority to pay, any prepetition claim without the Lender's prior written consent or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under this Agreement; or

7.2    <u>Remedies</u>

Upon the occurrence and during the continuance of an Event of Default, and without further order of or application to the Bankruptcy Court, the Lender shall, by notice to the Borrower (with a copy to counsel for the Committee appointed in the Chapter 11 Case, and to the United States Trustee for the District of Texas), take one or more of the following actions, at the same or different times: (i) terminate forthwith the Revolving Loan Commitments; (ii) declare the Loans or any portion thereof then outstanding to be forthwith due and payable, whereupon the principal of such Loans together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrowers accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; and (iii) take any other action or exercise any and all other rights or remedies under the Loan Documents, and under applicable law available to the Lender.

ARTICLE VIII
MISCELLANEOUS

8.1     Amendments and Waivers

Neither this Agreement, any Revolving Note or any other Loan Document, nor any terms hereof or thereof may be amended, restated, supplemented or modified except in writing signed by each of the parties hereto.

8.2     No Waiver; Cumulative Remedies

No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.   The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

8.3     Survival of Representations and Warranties

All representations and warranties made hereunder, in any other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the Revolving Notes and the making of the Loans hereunder.

8.4     Successors and Assigns; Participations and Assignments

(a)     This Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns, including any trustee appointed in this case.

(b)     Lender may, in accordance with applicable law, sell or assign its rights under this Agreement and any Obligations of Borrower hereunder.

(c)     The Borrower authorizes Lender to disclose to any Assignee (each, a "Transferee") and any prospective Transferee, any and all financial information in Lender's possession concerning the Borrower which has been delivered to Lender.

8.5     Counterparts

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by telecopy), and all said counterparts taken together

20

shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Lender.

8.6     Severability

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.7     Governing Law

THIS AGREEMENT AND THE REVOLVING NOTES AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND THE REVOLVING NOTES SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF TEXAS.

Submission To Jurisdiction; Waivers.   Borrower and Lender hereby irrevocably and unconditionally:

(a)     submit for themselves and their property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the jurisdiction of the Bankruptcy Court;

(b)     consent that any such action or proceeding may be brought in the Bankruptcy Court and waive any objection that they may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agree not to plead or claim the same;

(c)     agree that nothing contained herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(d)     waive, to the maximum extent not prohibited by law, any right they may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

21

8.8     No Waiver

No failure on the part of Lender to exercise, and no delay in exercising, any right, power or remedy hereunder or any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

8.9     Waiver of Claims

Upon the effectiveness of this Agreement, the Borrower shall be deemed to have (a) released and forever discharged Lender and its respective subsidiaries, agents, employees, officers, directors, managers, attorneys, affiliates, successors and assigns (collectively, the "Released Parties") of and from any and all liabilities, claims, obligations, indebtedness, liens, causes of action and rights of any kind, character or nature whatsoever, whether known or unknown, whether fixed or contingent, and whether liquidated or unliquidated, that the Borrower may have or claim to have against any such Released Party and which arises out of or is connected in any way with any action of commission or omission of the Borrower existing or occurring on or prior to the date of this Agreement, including without limitation any claims, liabilities or obligations relating to or arising out of or in connection with any of the transactions contemplated by any of the Loan Documents, from the beginning of time until the execution and delivery of this Agreement (collectively, the "Released Claims") and (b) agrees forever to refrain from commencing, instituting or prosecuting any law suit, action or other proceeding against any of the Released Parties with respect to any of such Released Claims.

*       *       *       *

22

IN WITNESS WHEREOF, the parties hereto has caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

TOOTIE PIE COMPANY, INC., Borrower

By: _____

Name:  TOOTIE PIE COMPANY, INC.

Title:  Debtor-in-Possession, Borrower

DAN GOSTYLO

By: _____

Name:  Dan Gostylo

Title:  Lender

CLIFF ROGERS

By: _____

Name:  Cliff Rogers

Title:  Lender

## PROMISSORY NOTE

$50,000.00                      San Antonio, Texas                      July ____, 2013

In installments as herein state, for value received, the undersigned, TOOTIE PIE COMPANY, INC., Debtor-in-Possession, promises to pay to Dan Gostylo and Cliff Rogers, Lender, at 129 Industrial Drive, Boerne, Texas 78006, the principal sum of Fifty thousand dollars ($50,000) with interest from the date of funds drawn, on unpaid principal at the rate of seven per cent (12.0%) per annum, compounded monthly.

Beginning on October 1, 2013, Debtor-in-Possession shall begin making monthly payments to Lender in the amount of 1/4 of the then outstanding principal and interest.

Final Payment shall be payable on the 31th day of January, 2013, at which time all unpaid principal and interest will be due and payable.

Each payment shall be credited first on interest then due; and the remainder on principal; and interest shall thereupon cease upon the principal so credited.  In the event of any default in the payment of any installment of principal or interest as herein provided all sums so due, including interest, shall bear interest at the rate set forth above, but such unpaid interest so compounded shall not exceed an amount equal to simple interest on the unpaid principal at the maximum rate permitted by law.  Should default be made in payment of any installment when due, the whole sum of principal and interest shall, at the option of the holder of this note, become immediately due.  Principal and interest payable in lawful money of the United States.  If suit or action shall be instituted in any Court to collect any sum becoming due on this note, the undersigned promises to pay such sum as the Court may adjudge reasonable as attorney's fees in said suit or action.

Borrower reserves the privilege to prepay this promissory note in part or in whole at any time prior to the maturity date without penalty.

TOOTIE PIE COMPANY, INC.
Debtor-in-Possession


_____
By: Don L. Merrill, President, CEO