**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **TOOTIE PIE COMPANY, INC. D/B/A** | § | **Case No. 13-51808** |
| **TOOTIE GOURMET PIE CAFÉ** | § | |
| | § | |
| **Debtor** | § | |
| | § | |

**TCA GLOBAL CREDIT MASTER FUND, LP'S AMENDED MOTION TO
FILE DERIVATIVE LAWSUIT ON BEHALF OF THE DEBTOR'S ESTATE**

> **THIS PLEADING REQUESTS RELIEF THAT MAY BE
> ADVERSE TO YOUR INTERESTS.**
>
> **IF NO TIMELY RESPONSE IS FILED WITHIN TWENTY
> ONE (21) DAYS FROM THE DATE OF SERVICE, THE
> RELIEF REQUESTED HEREIN MAY BE GRANTED
> WITHOUT A HEARING BEING HELD.**
>
> **A TIMELY RESPONSE IS NECESSARY FOR A HEARING
> TO BE HELD.**

TCA GLOBAL CREDIT MASTER FUND, LP ("**TCA Global**") hereby files the *TCA Global Credit Master Fund, LP's Amended Motion to File Derivative Lawsuit on Behalf of the Debtor's Estate* and in support hereof respectfully states as follows:

**I.
SUMMARY[1]**

1.      TCA Global is requesting that the Court grant it permission to commence a shareholder derivative action, substantially in the form of the Complaint attached hereto as **Exhibit A** (the "**Derivative Complaint**"), against certain of the Debtor's management for breach of fiduciary duty, abuse of control, gross mismanagement and waste of corporate assets.

---

[1] Capitalized terms not otherwise defined in this section have the definitions ascribed herein.

**TCA GLOBAL CREDIT MASTER FUND, LP'S AMENDED MOTION TO FILE DERIVATIVE
LAWSUIT ON BEHALF OF THE DEBTOR'S ESTATE - Page 1**

TCA Global is not requesting to pursue claims directly against the Debtor, but only derivatively as a shareholder of the Debtor. Because the Debtor is currently under the control of the very officers and directors that are subject to the claims in the Derivative Complaint, those officers and directors have irreconcilable conflicts of interest and cannot legitimately pursue the claims against themselves. Fifth Circuit authority dictates that when conflicts of interest exist that prevent a debtor-in-possession from fulfilling its fiduciary duty to assert claims to maximize the value of the estate, then it is appropriate for other parties in interest (such as creditors or shareholders) to pursue such claims as derivative actions on the estate's behalf. If TCA Global is successful in its efforts, the recovery[2] from the Derivative Complaint will inure to the Debtor's estate.

## II.
## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this chapter 11 case and this Motion pursuant to 28 U.S.C. §§ 1334 and 157(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) (A), (O). The statutory predicates for relief are 11 U.S.C. § 541, 1103(c)(5) and 105.

## III.
## BACKGROUND

### A.      The Loans

3.      On March 30, 2012, TCA Global and the Tootie Pie Company, Inc., d/b/a Tootie Pie Gourmet Café (the "**Debtor**") entered into a *Securities Purchase Agreement* (the "**SPA**"), pursuant to which TCA Global agreed to loan the Debtor up to $1,000,000 and a *Senior Secured Redeemable Debenture* ("**Debenture #1**"), pursuant to which, TCA Global loaned the Debtor

---

[2] TCA Global reserves the right to seek reimbursement of its costs in pursuing these shareholder derivative causes of action.

**TCA GLOBAL CREDIT MASTER FUND, LP'S AMENDED MOTION TO FILE DERIVATIVE LAWSUIT ON BEHALF OF THE DEBTOR'S ESTATE - Page 2**
Gardere01 - 6340636v.10

$350,000. Payments under Debenture #1 were due monthly beginning on May 1, 2012. Also on March 30, 2012, TCA Global and the Debtor entered into a Security Agreement (the "**Security Agreement**"), pursuant to which, the Debtor granted TCA Global a security interest in all of the Debtor's assets then existing or after acquired.

4.  On April 1, 2012, TCA Global properly perfected its security interest by filing a UCC-1 in Nevada.

5.  On July 31, 2012, TCA Global and the Debtor executed the *Securities Purchase Agreement* (the "**SPA Amendment**"), which provided for an additional loan of $350,000 from TCA Global to the Debtor represented by the *Senior Secured Redeemable Debenture* ("**Debenture #2**"). Payments were due under Debenture #2 monthly beginning September 1, 2012. Under both debentures, the Debtor was also required to pay a redemption premium. The redemption premium is 4% of the outstanding balance under Debenture #1 and 6% of the outstanding balance under Debenture #2.

6.  The Debtor failed to make the October 1, 2012 payment due under Debenture #2 resulting in an event of default under Debenture #2. The Debtor failed to make the November 1, 2012 payments due under Debenture #1 and Debenture #2, which triggered a default under Debenture #1.

7.  On or about December 10, 2012, TCA Global and the Debtor entered into a *Restructuring Agreement* (the "**Restructuring Agreement**," collectively, with the SPA, Debenture #1, Debenture #2, and the SPA Amendment, the "**Loan Documents**"). Pursuant to the terms of the Restructuring Agreement, the Debtor acknowledged its defaults and a restructured payment plan was entered into as set forth therein. The Restructuring Agreement reserved all, and did not waive any, of the rights and remedies of TCA Global. The Debtor also

agreed to pay a $50,000.00 restructuring fee. The Debtor failed to make payments under the Restructuring Agreement and defaulted.

8.     In addition to the principal and interest due under the Loan Documents, the Debtor was also required to issue stock to TCA Global. The Debtor issued TCA Global 328,829 shares of stock and TCA Global continues to hold those shares. The stock is subject to a mandatory redemption right that requires the Debtor to redeem the stock for cash upon written notice from TCA Global. The Debtor is obligated to repurchase the stock for $110,000.

9.     On February 5, 2013, TCA Global filed a lawsuit with the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida (the "**Florida Lawsuit**"). On June 14, 2013, TCA Global filed *Plaintiff, TCA Global Credit Master Fund, LP's Motion for Final Summary Judgment* (the "**MSJ**"). TCA Global alleged causes of action for breach of contract under the Loan Documents and foreclosure of its security interests. On July 3, 2013, shortly before the Debtor's response to the MSJ was due, the Debtor filed this bankruptcy proceeding.

10.     On July 25, 2013, the Court entered its *Stipulation and Interim Agreed Order Relating to Debtor's Request to Use Cash Collateral* [Docket No. 52], through which the Debtor stipulated that, as of the Petition Date, it is indebted to TCA Global in the amount of at least $716,411.97, comprised of $468,108.09 in principal under the debentures, $69,747.21 in accrued and unpaid interest, $45,000.00 in legal fees,[3] $28,000.00 in redemption premium charges, a $50,000.00 restructuring fee, and $53,000.00[4] related to the stock repurchase obligations. The Debtor stipulated that TCA Global's liens and security interests are valid, enforceable, binding,

---

[3] The Debtor stipulated to the legal fees subject to verification.
[4] TCA Global believes that it is entitled to $110,000.00 related to the stock repurchase obligations. The Debtor acknowledges that TCA Global is owed the stock repurchase obligations in the amount of at least $53,000.00 but believes the additional amounts related to the stock repurchase obligations may be reduced.

properly perfected, and not subject to reduction, impairment, avoidance, subordination, or disallowance pursuant to the Bankruptcy Code or applicable law.

**B.      General Basis for the Derivative Complaint**

11.      The Debtor incorporated in Nevada on June 16, 2005.  In 2006, the Debtor filed its registration statement with the Securities and Exchange Commission (the "**SEC**") and it was declared effective January 8, 2007.  At that time, the Debtor effectively became a publicly traded company.  Active trading of the Debtor's stock began on April 9, 2007 on the Over-the-Counter Bulletin Board, or OTCBB, under the symbol "TOOT."

12.      After becoming a publicly traded company, the Debtor failed to meet its reporting requirements.  On October 5, 2012, the Debtor delinquently filed its Form 10K Annual report for the fiscal year ending March 31, 2012.  The Debtor's books and records had been neither audited nor reviewed by any independent accounting firm registered with the Public Company Accounting Oversight Board (the "**PCAOB**"), in violation of SEC rules and regulations.  Moreover, the delinquent and deficient Form 10K filing, without audited financial statements, breached the covenant the Debtor entered into with TCA Global in the SPA requiring compliance with the SEC's filing requirements, thus triggering a default under the Loan Documents.

13.      SEC Form 8K, Items 2.03, 2.04, 3.03, 4.04 and 8 require a notice filing of such defaults, as occurred under the Loan Documents, within four (4) days of the triggering event.  The Debtor did not file any subsequent 8K following the deficient Form 10K and failed to disclose the default under the SPA or the Debentures, which exposed all of its assets and properties to liquidation.

14.     On November 16, 2012, the Debtor filed its Form 10Q (Quarterly Report) with the SEC for the period ending September 30, 2012. The Form 10Q repeated the transactions with TCA Global, without making any reference to the pending defaults resulting from the deficient Form 10K filing or from the Debtor's default under the Debenture instruments for failure to make timely payment. In particular, there was no additional or amended risk factor in the Form 10Q which spoke to the exposure, and no additional information provided regarding threatened or potential litigation. To the contrary, the Form 10Q stated under the heading "Defaults Upon Senior Securities: During the quarter ending June 30, 2012, we did not have any defaults on senior debt securities." Yet, at the time of this filing, the Debtor's management knew that the Debtor was in default under the Loan Documents and that the assets, properties and business were at risk.

15.     On February 15, 2013, the Debtor filed a Form 10Q for the period ending December 31, 2012. As with the prior SEC filings, the Debtor failed to disclose, *inter alia*:

   a. its inability to pay the stipulated amounts due under the Debentures;

   b. the risk of foreclosure of the collateral pursuant to the Security Agreement;

   c. the accelerated amounts due under the Debenture;

   d. the Restructuring Agreement and the default thereunder; and

   e. the Florida Lawsuit.

16.     Instead, the Debtor chose to misrepresent and to mislead the SEC and its shareholders by stating that:

   a. the Debtor was not aware of any threatened or pending legal proceedings;

   b. there were no material changes to the previously reported risks factors; and

       c. for the quarter ending December 31, 2013, there were no defaults on senior securities.

17.    The Debtor's board of directors is comprised of Don Merrill, David Strolle, Cliff Rogers, and Leslie E. Doss (the "**Board**"). The Debtor's officers are comprised of David Strolle, Dan Gastylo and Don Merrill (the "**Officers**," collectively, with the Board, the "**Management**"). It was Management's obligation to insure that the statements made in the SEC filings were not misleading due to subsequent events. In fact, all of the public filings were signed by one or more of the Debtor's Management.

18.    Management caused the Debtor to report false and misleading information in these filings by failing to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have an adverse effect on the Debtor's liquidity, net sales, revenues and income from continuing operations, as required by SEC Regulation S-K.[5]

19.    The Debtor's Management knew and ignored, or were reckless in not knowing, the facts which indicated that the public statements and filings with the SEC which were disseminated to the investing public were false and misleading.

20.    In addition to the false and misleading SEC filings, the Debtor's former chief executive officer, Mr. Merrill previously testified in this case relating to the DIP Motion, a copy of the transcript is attached hereto as **Exhibit B**. Mr. Merrill's testimony revealed the mismanagement of the Debtor that occurred prior to the Petition Date and apparently continues to exist even after the Petition Date,

---

[5] SEC Regulation S-K sets out a number of requirements applicable to the content of the non-financial portions of registration statements, annual and other reports, tender offer statements, and other documents required to be filed per the Securities and Exchange Act of 1934. *See* 17 C.F.R. 229.10.

**C.**     **Conference with the Debtor's Counsel**

21.     TCA Global contends that there are colorable claims against the Debtor's Management for breach of fiduciary duty, abuse of control, gross mismanagement, and waste of corporate assets.   On July 29, 2013, TCA Global conferred with counsel for the Debtor regarding the claims in the Derivative Complaint.   The Debtor's counsel stated that he has presented the Derivative Complaint to the Debtor, but has not responded on whether the Debtor will pursue the claims.   Regardless, TCA Global believes that the Debtor will refuse to pursue the claims in the Derivative Complaint because it is controlled by the directors and officers who are named as defendants in the Derivative Complaint; therefore, the Debtor is conflicted from pursuing the claims in the Derivative Complaint, and is otherwise incapable of doing so in an effective manner.

**IV.**
**RELIEF REQUESTED AND BASIS THEREFOR**

25.     The Fifth Circuit has recognized that a debtor-in-possession has the authority and the obligation "to bring an action for damages on behalf of a debtor corporation against corporate principals for gross negligence, mismanagement or breach of fiduciary duty where such an action could have been asserted by the debtor corporation, or by its stockholders, in a derivative action prior to the bankruptcy."  *See Louisiana World Expo. v. Fed. Ins. Co.*, 858 F.2d 233, 246 (5th Cir. 1988).   The debtor-in-possession performs essentially the same functions as a trustee in a chapter 11 case, and therefore has both the right and the fiduciary duty to collect all estate property and "maximize the value of the estate" on behalf of its constituents. *See id.* (internal citations omitted).   Claims against a debtor's principals are property of the

debtor's estate, and a trustee (or debtor-in-possession) has a duty to bring such claims in order to maximize the value of the estate. *See id.*

26.     In some instances, debtors-in-possession may have "a conflict of interest that prevents them from maximizing the value of the estate, which in turn requires creditors to assert derivative claims in order to protect their interests." *See Cambridge Realty West, L.L.C. v. NOP, L.L.C.*, 2010 WL 4668436, at *2 (E.D. La., Nov. 8, 2010) (citing *Louisiana World Expo.*, 858 F.2d at 246).  A creditor's right and duty to bring a derivative action in such circumstances applies equally to a sole creditor as it does to an unsecured creditors committee. *See id.* (granting a sole creditor permission to bring a derivative action on behalf of a debtor's estate, and observing that the Fifth Circuit's holding in *Louisiana World Expo* applied to a creditors' committee and to any creditor's right to bring a derivative action on behalf of a debtor's estate); *see also Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.),* 555 F.3d 231, 244-45 (6th Cir. 2009) (granting a sole secured creditor the right to bring a derivative action on behalf of the estate).

27.     Under *Louisiana World Expo*, a creditor must satisfy certain procedural requirements before it may bring a derivative action on behalf of a debtor's estate. *See id.* at *4 (citing *Louisiana World Expo.*, 858 F.2d at 247).  Specifically, it must: (i) establish that the claim is colorable; (ii) demonstrate that the debtor-in-possession unjustifiably refused to pursue the claim when called on to do so; and (iii) receive permission from the bankruptcy court to bring the derivative action. *See id.*

28.     Here, TCA Global has satisfied the first and second procedural requirements in order to bring a derivative action against the Management, and is requesting permission from the Court to bring the derivative action.

**TCA GLOBAL CREDIT MASTER FUND, LP'S AMENDED MOTION TO FILE DERIVATIVE LAWSUIT ON BEHALF OF THE DEBTOR'S ESTATE - Page 9**

Gardere01 - 6340636v.10

29.    TCA Global is an equity holder and creditor of the Debtor who can represent the Debtor's interests in the derivative action.  Any recovery by TCA Global on its derivative claims will inure to the Debtor's estate and will increase the ultimate recovery of the Debtor's constituents.

WHEREFORE, TCA Global requests that the Court enter an order: (a) permitting TCA Global to file the Derivative Complaint against the Debtor's Management, and (ii) granting TCA Global such other and further relief as the Court deems justified.

DATED:  August 1, 2013                    Respectfully submitted by:

                                          */s/ Holland N. O'Neil*
                                          Holland Neff O'Neil (TX 14864700)
                                          Virgil Ochoa (TX 24070358)
                                          **GARDERE WYNNE SEWELL LLP**
                                          3000 Thanksgiving Tower
                                          1601 Elm Street
                                          Dallas, TX 75201-4761
                                          Telephone:  (214) 999-3000
                                          Facsimile: (214) 999-4667
                                          honeil@gardere.com
                                          vochoa@gardere.com

                                          **COUNSEL FOR TCA GLOBAL CREDIT
                                          MASTER FUND, LP**

                                **CERTIFICATE OF CONFERENCE**

I hereby certify that on July 29, 2013, I contacted Ronald Smeberg, counsel for the Debtor, via telephone and email, regarding the relief requested herein.  Mr. Smeberg stated that he has presented the Derivative Complaint to the Debtor's Management and the Debtor reserves its rights to object to the relief requested herein.

                                          */s/ Holland N. O'Neil*
                                          Holland N. O'Neil

**TCA GLOBAL CREDIT MASTER FUND, LP'S AMENDED MOTION TO FILE DERIVATIVE
LAWSUIT ON BEHALF OF THE DEBTOR'S ESTATE - Page 10**
Gardere01 - 6340636v.10

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Motion was served on August 1, 2013, electronically by the Court's PACER system on all parties requesting such notice.

*/s/ Virgil Ochoa*
Virgil Ochoa

## **EXHIBIT A**

**FOLLOWS THIS COVER PAGE**

IN THE UNITED STATES DISTRICT COURT FOR THE _____-

_____

TCA Global Credit Master Fund, LP,
a Cayman Limited Partnership, on behalf of
itself and other stockholders of Tootie Pie Company, Inc.

CASE NO._____

vs.

Don L. Merrill, Jr., Dan Gostylo, David P. Strolle, Jr.
Cliff  Rogers,  and Leslie E. Doss

and

Tootie Pie Company, Inc. (a necessary non-defendant party)

_____/

## DERIVATIVE COMPLAINT [VERIFIED]

      Plaintiff, TCA Global Credit Master Fund, LP, ("TCA" or "Plaintiff"), by and through its undersigned counsel, sues the Defendants Don L. Merrill, Jr.,  Dan Gostylo, David P. Strolle, Jr. Cliff Rogers, and Leslie E. Doss, and states and alleges as follows:

      1.      This is a shareholders' derivative action brought pursuant to Nevada Statute 41.520 for the benefit of Tootie Pie Company, Inc. ("TPC" or the "Company"), currently in Chapter 11 Bankruptcy proceeding pending in the U.S. Bankruptcy Court, Western District of Texas, Case No. 13-51808-cag, against its officers and directors Don L. Merrill, Jr. ("Merrill"), Dan Gostylo ("Gostylo"), David P. Stolle, Jr.("Strolle"), Cliff  Rogers ("Rogers"), and Leslie E. Doss ("Doss") (the "Individual Defendants") seeking to remedy intentional, reckless or negligent breaches of fiduciary duty, mismanagement and abuses of control that occurred between March 30, 2012 and the filing date of this Complaint ("Relevant Period").

## JURISDICTION AND VENUE

2.      This Court has jurisdiction under 28 U.S. C. because Plaintiff, on the one hand and the Defendants, on the other hand, are citizens of different states.

3.      Venue is proper in this District under 28 USC 139(a)(2) & (b)(2) because substantially all of the events giving rise to the claims herein occurred in this District.  The amount in controversy exceeds $75,000.00.

4.      Plaintiff is and was at all times relevant to this action a Cayman Island limited partnership, with its principal place of business at Hollywood, Broward County, Florida.  The general partner of TCA is TCA Global Credit Fund GP Ltd. ("TCA LTD"), a Cayman Island entity.

5.      Defendant Merrill, at all times relevant to this action, was a director, the Chief Executive Officer, Principal Accounting Officer, and Interim Chief Financial Officer, of Tootie Pie Company, Inc. ("TPC").  On July 9, 2013, TPC announced the resignation of Defendant Merrill as CEO.  He remains a director of TPC.

6.      Defendant Gostylo, at all times relevant to this action, served as a director and as Chairman of the Compensation Committee of TPC.

7.      Defendant Strolle, at all times relevant to this action, served as a director and as general counsel of TPC.

8.      Defendant Rogers, at all times relevant to this action served as a director of TPC.

9.      Defendant Doss, at all times relevant to this action served as a director of TPC. Upon the resignation of Defendant Merrill in his officer capacities in July 2013, Defendant Doss accepted all of the officer positions previously held by Defendant Merrill.

10.     TPC, not a party as it filed for Chapter 11 Bankruptcy protection on July 3, 2013, was at all times relevant to this action, a Nevada corporation, in the business of manufacturing, marketing and selling handmade fully-baked hand quality pies.  TPC is publicly traded and is required to file reports as a Securities and Exchange Commission ("SEC") reporting company on the SEC's EDGAR system.

## BACKGROUND

11.     TPC describes itself as a pie manufacturing company with retail marketing throughout the United States and wholesale marketing covering thirteen (13) states in the south, southeastern, and central United States.

12.     On or about March 30, 2012, TCA and TPC entered into a Stock Purchase Agreement ("SPA"), pursuant to which TCA agreed to loan TPC up to $1,000,000, subject to the terms of various transaction documents, which included, among other things, a Senior Secured Redeemable Debenture ("Debenture") and Security Agreement ("SA")(which secured the debt with collateral and which interest was perfected pursuant to a UCC-1 filing in Nevada).  As part of the consideration for engaging in this loan transaction with TPC, the Plaintiff received shares of TPC's common stock which it has held and continues to hold during the Relevant Period.  In other words, Plaintiff satisfied the requirement of Nevada law requiring it to be a shareholder at the time of the transaction of which it complains continuously to the present date.

13.     On March 30, 2012, TPC executed the Debenture#1 in favor of the Plaintiff and in exchange for a loan of Three Hundred Fifty Thousand Dollars ($350,000).  The Debenture required that TPC make monthly payments of principal, interest and the corresponding amount of redemption premium to the Plaintiff, commencing on the first (1st) day of May, 2012 and on the first (1st) day of each consecutive calendar month thereafter while the Debenture remained

3

outstanding, until the maturity date.   On the same date, Debenture #1 was executed in favor of the Plaintiff and the $350,000 loan was made to TPC by the Plaintiff.

14.     Debenture#1 was secured with the collateral identified in the SA, both of which were executed between the parties on March 30, 2012. The collateral pledged included all of the assets and property of the Company.

15.      On April 6, 2013, TPC announced the TCA transaction on Form 8K filed with the SEC and signed by Defendant Merrill.  The Form 8K stated, in part,

> "Upon the occurrence of an event of default under the Debenture, the interest rate on the Debenture shall increase and immediately accrue at the maximum interest rate permitted by applicable law, and TCA would be entitled, in its sole direction, to acceleration of full repayment of the debt plus all accrued interest and redemption premiums due under the Debenture…. The Debenture is secured by all of the assets and properties of the Company pursuant to the Security Agreement."

16.     On May 22, 2012, TPC terminated its accounting relationship with its independent auditors Akin, Dohtery, Klein & Feuge, CPAs and engaged M & K CPAs PLLC ("M & K") as its independent auditor.  On information and belief, M & K were not registered with, nor approved by, the Public Company Accounting Oversight Board ("PCAOB") as required by the Sarbanes-Oxley Act of 2002, as amended.

17.     On July 31, 2012 the parties executed an Amendment to the SPA ("SPA Amendment") which provided for a purchase by the Plaintiff of an additional TPC Debenture with the face value of Three Hundred Fifty Thousand Dollars ($350,000).  On the same date, Debenture #2 was executed in favor of the Plaintiff and the $350,000 loan was made to TPC.

18.     Principal and interest on  each of the Debenture#1 and Debenture #2  were due to be paid in twelve (12) installments until the full amount of the face value of each, plus

redemption premium, interest and investment banking fees, was paid to TCA Global on April 1, 2013 and August 1, 2013, respectively ("Maturity Dates").

19.     On October 9, 2012, TPC announced in a Form 8K filed with the SEC that it terminated its relationship with M & K.

20.     Previously, on October 5, 2012, TPC delinquently (having claimed its auditors needed additional time to file) filed its Form 10K Annual report for the fiscal year ending March 31, 2012, despite the fact that it was neither audited nor reviewed by any independent accounting firm registered with the PCAOB, in violation of SEC rules and regulations.  Moreover, the delinquent and deficient Form 10K filing, without audited financial statements, breached the SPA covenant requiring compliance with the SEC's filing requirements and triggered a default under the SPA and related loan documents, including the SA.  The Form 10K was signed by all of the Defendant directors and officers.

21.     Form 8K, Items 2.03, 2.04, 3.03, 4.04 and 8 requires a filing of such default within four (4) days of the triggering event.  TPC did not file any subsequent 8K following the deficient Form 10K filing disclosing the default under the SPA or the Debentures, which exposed all of its assets and properties to liquidation.

22.     TPC failed to make the November 1, 2012 payment, which triggered the Notice of Default of the Transaction Documents being delivered to TPC on November 30, 2012**.** The November 2012 payment was ultimately received following the Restructuring Agreement in December 2012.

23.     On November 16, 2012, TPC filed its Form 10Q (Quarterly Report) with the SEC for the period ending September 30, 2012, which was signed by Defendant Merrill.  The Form 10Q repeated the TCA transaction, without making any any reference to the pending Defaults

resulting from the deficient Form 10K filing or from TCP's default under the Debenture instruments for failure to make timely payment.  In particular, there was no additional or amended risk factor in the Form 10Q which spoke to the exposure, and no additional information provided regarding threatened or potential litigation.  To the contrary, the Form 10Q stated under the heading "Defaults Upon Senior Securities: During the quarter ending June 30, 2012, we did not have any defaults on senior debt securities."  While this statement is true on its face (there were none to Plaintiff's knowledge prior to June 30, 2012) at the time it was made, the Individual Defendants knew that the TCA SPA and Debentures were in default and that the assets, properties and business were in risk of being lost.  It was the Individual Defendants' obligation to insure that the statements made in the SEC filings were not misleading due to subsequent events.

24.     Notwithstanding the Notice of Default and need for the Restructuring Agreement, TPC failed to make the December 1, 2012 payment due under Debenture #1, again resulting in an event of default under the Debenture#1 and implicating the default and remedy provisions of Debenture #1 and #2 and, without limitation, acceleration of the principal and interest at the highest legal rate available by law, redemption premium, and pre-payment liquidated damages.

25.     TPC had also failed to make the October 1, 2012 payment due under Debenture #2 resulting in an event of default under the Debenture #2 and implicating the default and remedy provisions of Debenture #2 and Debenture #1, including, without limitation, acceleration of the principal and interest at the highest legal rate available by law and redemption premium, and pre-payment liquidated damages.

26.     Despite these defaults and the draconian prospect to TPC, the Individual Defendants did not file any disclosure regarding these events with the SEC.

6

27.     On or about December 10, 2012, with TPC having now defaulted under both Debentures, the parties jointly executed a "Restructuring Agreement."  Pursuant to its terms, TPC acknowledged that it was currently in default of its obligations under the Debentures, and a new payment plan was devised.   The Restructuring Agreement also acknowledged that it would not be deemed a waiver of the rights or remedies of the Plaintiff under the loan documents, and all of the terms and conditions and representations of the loan documents would continue to remain in full force and effect.

28.     Notwithstanding the agreed upon terms of the Restructuring Agreement, TPC failed to make the restructured payments. Notice of Default under the Restructuring Agreement was sent to TPC on January 16, 2013.

29.     Pursuant to Section 3.01 of each of the Debentures, by failing to make the restructured payments and by failing to pay the interest, principal, redemption premiums and other obligations due pursuant to the terms of the Debentures and other Transaction Documents, TPC triggered an Event of Default which has not been timely cured.

30.     On February 5, 2013, The Plaintiff filed a lawsuit against TPC in the Circuit Court of Broward County, Florida (Case No. 13-003211) for the defaults under the SPA, Debentures and Security Agreement, and sought to foreclose on the collateral ("Florida Complaint").  Plaintiff had filed a motion for summary judgment which was pending at the time TPC filed its petition in bankruptcy court in Texas.  Prior to and subsequent to the filing of the Florida Complaint, contact was made with TPC's director and general counsel, Strolle, advising him of the suit and the need for the filing of a Form 8K with the SEC.

31.     On February 15, 2013, Plaintiff's counsel delivered a demand letter to defendant Merrill, with a copy to Strolle, summarizing the defaults and the failure to properly file disclosures with the SEC regarding the default and the pending Florida Complaint.  A copy of this letter is attached as **Exhibit A**.  This letter was ignored by the Individual Defendants.

32.     On February 15, 2013 the Defendants filed a Form 10Q signed by Defendant Merrill for the period ending December 31, 2013. As with the prior SEC filings, the Individual Defendants failed  to disclose:

   a.  its inability to pay the stipulated amounts due under the Debentures;

   b.  the risk of foreclosure of the collateral pursuant to the Security Agreement;

   c.  the accelerated monies due under the Debenture;

   d.  the Restructuring Agreement and the default thereunder, and

   e.  the Florida Complaint.

33.     Instead, the Individual Defendants chose to misrepresent and to mislead the SEC and its investors by stating that:

   a.  TPC was not aware of any threatened or pending legal proceedings;

   b.  there were no material changes to the previously reported risks factors; and

   c.  for the quarter ending December 31, 2013, there were no defaults on senior securities.

34.     On July 9, 2013, the Individual Defendants announced in a Form 8K that effective July 3, 2013, TPC had filed for Chapter 11 bankruptcy protection and that Defendant Merrill "…agreed to resign his position as President/Chief Executive Officer/interim Chief Financial Officer, but will continue to remain director."  Defendant Doss agreed to fill the positions vacated by Defendant Merrill.

8

35.    At no time prior to July 9, 2013, did the Individual Defendants publicly announce the conditions described in ¶¶32-33 above which most certainly, in part, led to its bankruptcy filing.  In fact, the financial picture displayed in the prior filings by TPC, including its most recent Form 10Q filing was, "We believe our current working capital will be adequate to fund our operations for the next twelve months, based upon *conservative revenue forecast*." (Emphasis added).  This was the Individual Defendants' statement on February 15, 2013, despite having failed to make payments on one or both of the Debentures since October 2012.

36.    The Individual Defendants have never made any public filing correcting the misstatements or misleading information contained in TPC's prior SEC filings.  To date, none of the TPC financial statements ever contained any reference or footnote to the contingent liability based upon the defaults on the Debentures or ultimately the pending lawsuit.

37.    Over the period from October through July 9, TPC has traded at artificially high prices ranging from $0.25 on October 1, 2012 to $0.16 on July 8, 2013.  On July 9, 2013, the filing date of the Form 10K announcing the bankruptcy, the stock price dropped to $0.06 and on July 10 to $0.035 a decline of _____% and _____% respectively.  July 9 and 10, 2013 also represented the greatest volume of trading in the history of TPC, with 690,000 and 504,000 shares traded respectively.  At this time Plaintiff is uncertain as to whether any insiders have sold their shares with advance knowledge of the bankruptcy and financial condition of TPC.

38.    In particular, the February 15, 2013 10Q filing with the SEC required that Merrill certify:

**CERTIFICATION PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**
**(18 U.S.C. SECTION 1350)**

I, Don L. Merrill, Jr., certify that:

9

1. I have reviewed this Quarterly Report of Tootie Pie Company, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. As the registrant's certifying officer, I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under my supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to me by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under my supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report my conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. As the registrant's certifying officer, I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 15, 2013                    By:  /s/ Don L. Merrill, Jr.
                                                Don L. Merrill, Jr.
                                                President, Chief Executive Officer, Interim
                                                Chief Financial Officer
                                                (Principal Executive Officer and Principal
                                                Accounting Officer)


### CERTIFICATION PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
### (18 U.S.C. SECTION 1350)

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), the undersigned officer of Tootie Pie Company, a Nevada corporation (the "Company"), hereby certifies, to such officer's knowledge, that:

The Quarterly Report on Form 10-Q for the quarter ended December 31, 2012 (the "Form 10-Q") of the Company fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and the information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.


Date: February 15, 2013                    By:  /s/ Don L. Merrill, Jr.
                                                Don L. Merrill, Jr.
                                                President, Chief Executive Officer, Interim
                                                Chief Financial Officer
                                                (Principal Executive Officer and Principal
                                                Accounting Officer)


39.    Similar representations are required for the filing of the Form 10K, which were also signed by the other Individual Defendants.

40.    By the filing of the Bankruptcy petition the Individual Defendants have admitted that the statements made in TPC's filings regarding its financial ability to meet its obligations with the SEC were false when they were made.

41.    The Individual Defendants' accounting improprieties have admittedly misstated the TPC operating results.

42.     The Individual Defendants caused TPC to file Forms 10-K and 10-Q with the SEC, which were false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have an adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Regulation SK.

43.     In addition to the inaccurate, incomplete, and misleading representations in the Forms 10-K and Forms 10-Q referenced hereinabove and the financial statements contained therein, these documents filed with the SEC were false and misleading. They each failed to disclose the material weaknesses in TPC's internal controls and the resultant deficiencies in the Company's financial reporting which rendered the Company's published financial statements inaccurate and unreliable at best.  In this regard, Management's Discussion and Analysis or Plan of Operations (the "MD&A"), which appeared in each of the above-described filings with the SEC, failed to comply with the spirit of the SEC's disclosure guidelines as set forth in an interpretative release issued by the SEC (Securities Act Release No 6835), which stated in relevant part, that the MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospectus for the future. As the Concept Release states:

> "The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials."

12

As the Commission has stated,

> "[lit is the responsibility of management to   identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding an evaluation of the individual company. "

44.     The Individual Defendants knew and ignored, or recklessly failed to discover that, during the Relevant Period, the Company did not have the requisite accounting controls to reliably measure non-cash transactions, revenues, and expenses.  Accordingly, during the Relevant Period, the Individual Defendants either knowingly or recklessly permitted the dissemination of misstated financial statements.

45.      The Individual Defendants were required to cause the Company to disclose, in its periodic filings with the SEC, financial statements, and news releases, the existence of the material facts described herein and to appropriately recognize and report expenses in conformity with GAAP. The Individual Defendants failed to cause the Company to make such disclosures and to account for and to report expenses and obligations in conformity with GAAP.

46.      Due to the pervasiveness of the non-disclosures, deceptive disclosures, and non-GAAP accounting, the financial statements which the Individual Defendants caused the Company to disseminate to the investing public during the Relevant Period, were (as described in SEC Staff Accounting Bulletin No. 99) false and misleading.

47.     The Individual Defendants knew and ignored, or were reckless in not knowing, the facts which indicated that the above-particularized public statements and filings with the SEC which were disseminated to the investing public during the Relevant Period, were false and misleading for the reasons set forth above.

48.     SEC Regulation S-X requires that financial statements filed with the SEC conform with GAAP Financial statements filed with the SEC which are not prepared in

conformity with GAAP are presumed to be misleading or inaccurate [ 17 C.F.R § 210.401 (a)(1)]. The Company's financial statements which were disseminated to the investing public during the Relevant Period, which represented that the Company's financial position and results of operations were in conformity with GAAP, were false and misleading for the reasons alleged herein and because they constituted a departure from GAAP.

Said financial statements violated, among others, the following GAAP concepts:

(a)     The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Financial Accounting Concepts No. 1);

(b)     the concept that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Financial Accounting Concepts No. 1);

(c)     the concept that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Financial Accounting Concepts No 2);

(d)     the concept of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Financial Accounting Concepts No. 2);

(e)     the concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Financial Accounting Concepts No 2); and

(f)     the concept that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form (FASB Statement

14

of Financial Accounting Concepts No 2)

49.     Each Form 10-Q, which the Individual Defendants caused the Company to be filed with the SEC during the Relevant Period, contained a substantially identical representation regarding the condition of the TCA loan transactions and the ability of the Company to satisfy its obligations.

50.     For the reasons set forth above, the Individual Defendants knew or were reckless in not knowing that the financial statements of the Company which were disseminated to the investing public during the Relevant Period did not fairly present the Company's results of operations and financial position in conformity with GAAP because the financial statements, including the related notes, were not informative of matters that affected their use, understanding, and interpretation; and the financial statements did not reflect the underlying events and transactions in a manner that presented the financial position and the results of operations within a range of acceptable limits that were reasonable and practicable to attain in financial statements.

51.     The SEC has stated, in Securities Act Release No 6349 that "it is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company"

52.     In addition, as noted by the SEC in Accounting Release 173, " it is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations,"

53.     The Individual Defendants, in contravention of GAAP, failed to disclose the above-discussed facts concerning the Company's deficient internal controls and non-GAAP accounting, and the overall impression created by the financial statements was not consistent with the business realities of the Company's reported financial position and operations.

54.     Between January and July 2013, the Plaintiff has, on various occasions attempted to assist the Company in a restructuring effort, but all entreaties have been rejected

15

or ignored by the Individual Defendants.

## DERIVATIVE AND DEMAND ALLEGATIONS

55.     Plaintiff brings this action pursuant to Nevada Statute 41.520, derivatively in the right and for the benefit of TPC to redress injuries suffered and to be suffered, by TPC as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and knowing violations of federal and state securities laws, acts of bad faith and other breaches of fiduciary duty by the Individual Defendants.

56.     Plaintiff will adequately and fairly represent the interests of TPC and its shareholders in enforcing and prosecuting its rights.

57.     Plaintiff is and was an owner of both the stock and Debentures of TPC during the Relevant Period and all times relevant to Defendants' wrongful course of conduct alleged herein.

58.     On February 15, 2013, the Plaintiff made a written demand to TPC, to correct the failures to file appropriate disclosure documentation with the SEC, which demand was ignored by the Individual Defendants.  Indeed, neither the Board of Directors nor the Company ever advised Plaintiff of any remedial action taken respecting Plaintiff's demand.  The rejection of the Plaintiff's demand is noted by the failure to file or correct its SEC filing up to the date of this Complaint.

59.      Plaintiff believes that a demand is not necessary because TPC is a Nevada corporation.   In short, Nevada corporate law does not require a Plaintiff to make a demand on a company's board of directors prior to the filing of a complaint, if such demand would be futile. See, NRS 41.520 (2) Nevada Statutes.   Further demands would be futile on the Individual Defendants, due to the fact that none of the Board members are disinterested or can impartially

16

resolve the violation which has occurred to date. The Individual Defendants are directly responsible for, or aided in the filing of the false documents with the SEC, and therefore are directly implicated in the claims set forth below.

60.     Each of the Individual Defendants authorized and/permitted the false statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

61.     Despite the Individual Defendants' knowledge of the claims and causes of action raised by Plaintiff, the current Board has failed and refused to seek to recover for TPC for any of the wrongdoing alleged by Plaintiff herein.

62.     After a reasonable period of time had elapsed after Plaintiff had made the February 15, 2013 demand on the Company, and having heard nothing from it, Plaintiff filed this action for relief on July ___2013. Thus, the Company's Board of Directors has failed to take appropriate action in response to Plaintiff's demand letter and has shown that it will not act in good faith in evaluating Plaintiff's demand.

**Lack of Objectivity Among The Company's Board of Directors**

63.     Each of the Company's directors participated in corporate governance during the Relevant Period, including during Defendant Merrill's tenure as CEO, president, Interim Chief Financial Officer, and Chief Accounting Officer. As such, the Board and its general counsel, Strolle (also a Director), appear to have historical ties to Defendant Merrill and lack objectivity necessary to effectively investigate and prosecute claims against his confederates. To date, no independent directors have been appointed to the present Board of Directors, a fact

17

underscored by the cosmetic removal of Defendant Merrill, but not as a Director.

64.    The Company's Board of Directors is incompetent to initiate the corporate governance needed to protect its shareholders.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

65.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1-64 above, as though fully set forth herein.

66.    The Individual Defendants breached their fiduciary duties to the Company and to its shareholders by failing in their responsibility to maintain adequate controls, which artificially inflated the value of the Company's common stock.

67.    The Individual Defendants owed a fiduciary duty to the Company to supervise the issuance of its public filings to insure that they were truthful and accurate and that they conformed with federal and state law.  The Individual Defendants breached their fiduciary duty by failing to properly supervise and monitor the Company's internal financial controls and by allowing the misleading financial statements to be issued and made.

68.    The Individual Defendants have engaged, knowingly or recklessly, in a sustained and systematic failure to exercise their oversight responsibilities to ensure that the Company complied with federal and state laws, rules and regulations to ensure the integrity of its financial reporting.

69.    As a result of the Individual Defendants' breaches of fiduciary duty, the Company has lost market share, has had its reputation in the business community irreparably tarnished and has thus, been damaged.

70.    The conduct outlined herein was not due to an honest error of judgment, but rather

18

to the Individual Defendants' bad faith and was done knowingly, willfully, intentionally or recklessly.

71.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Abuse of Control

72.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1-64 above, as though fully set forth herein.

73.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

74.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has sustained significant damages.

75.     For the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at and control over the Company, the Individual Defendants have continued (to the date of the filing of the Chapter 11 Bankruptcy Petition) to receive the substantial benefits, salaries and emoluments associated with their positions. As a part of this scheme, the Individual Defendants actively made and/or participated in the making of or aided and abetted the making or the concealment of, numerous omissions and misrepresentations of facts regarding the Company to shareholders. These representations and statements were untrue and the Individual Defendants did not believe them to be true when made, and knowingly and/or recklessly made them without regard to their truthfulness or aided and abetted the making of said representations.

76.     As a result of the misconduct alleged herein, the Individual Defendants are

19

liable to the Company. Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Gross Mismanagement

77. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1-64 above, as though fully set forth herein.

78. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

79. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages. The Individual Defendants by their actions and by engaging in the actions described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law, including Sarbanes-Oxley. The Individual Defendants breached their duties of due care, diligence and candor in the management and administration of the Company's affairs and in the use and preservation of the Company's assets.

80. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet these Individual Defendants caused the Company to engage in this scheme which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged the Company.

81.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.  Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT 1V

### Against the Individual Defendants for Waste of Corporate Assets

82.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1-64 above, as though fully set forth herein.

83.     As a result of the improper accounting and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the Individual Defendants have caused the Company to waste valuable corporate assets by requiring the filing of bankruptcy, incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions, ignoring and rejecting opportunities for restructuring and remedying the abusive corporate action previously taken.

84.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company and Plaintiff, on behalf of the Company, has no adequate remedy at law.

**WHEREFORE,** Plaintiff demands judgment as follows:

A.     Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure Defendants do not participate therein or benefit thereby;

B.     directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a

constructive trust thereon;

C.    directing the Company to take all necessary actions to reform and improve their corporate governance and internal control procedures to comply with Sarbanes-Oxley;

D.    awarding punitive damages;

E.    awarding costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

F.    granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

*Plaintiff demands a trial by jury.*

## VERIFICATION by TCA GLOBAL CREDIT MASTER FUND, LP

I HAVE READ the foregoing Derivative Complaint and know its contents to be true.

Dated: _____                  _____

                                          BOB PRESS, as _____

NOTARY BLOCK –

                                  Law Offices of Allan M. Lerner, P.A.
                                  *Co-Counsel for Plaintiff*
                                  2888 East Oakland Park Boulevard
                                  Fort Lauderdale, FL 33306
                                  Tel: (954)563-8111
                                  Fax: (954)563-8522
                                  Electronic Mail: Allan@lernerpa.com

                                  By:_____
                                       Allan M. Lerner
                                       FBN 196681

Dated _____

## **EXHIBIT B**

**FOLLOWS THIS COVER PAGE**

July 5, 2013,

IN  THE  UNITED  STATES  BANKRUPTCY  COURT

FOR  THE  WESTERN  DISTRICT  OF  TEXAS

SAN  ANTONIO  DIVISION


IN RE:                         * Case No. 13-51808
                               *
TOOTIE PIE COMPANY, INC., D/B/A,*
TOOTIE GOURMET PIE CAFE,        *
                               *
     Debtor.                   * July 5, 2013


------------------------------------------------------

BEFORE THE HONORABLE RONALD B. KING

BANKRUPTCY JUDGE

------------------------------------------------------


#2 - Expedited Motion to Obtain Credit Under Section
364(b), Rule 4001(c) or (d) filed by Ronald J. Smeberg
for Debtor Tootie Pie Company, Inc., d/b/a Tootie Pie
Gourmet Cafe.

#3 - Expedited Motion to Pay Prepetition Employee
Obligations Filed by Ronald J. Smeberg for Debtor
Tootie Pie Company, Inc., d/b/a Tootie Pie Gourmet
Cafe.
***SET ON EXPEDITED BASIS - MR. SMEBERG RESP. FOR
NOTICE***


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

July 5, 2013,

1              A P P E A R A N C E S

2

   GARDERE WYNNE SEWELL, LLP
3  By:  Mr. Virgil Ochoa
   1601 Elm Street, Suite 3000
4  Dallas, Texas  75201
   Appearing for TCA Global Credit Master Fund, LP;

5

6  GARDERE WYNNE SEWELL, LLP
   By:  Ms. Holland O'Neil
7  1601 Elm Street, Suite 3000
   Dallas, Texas  75201
8  Appearing for TCA Global Credit Master Fund, LP;

9

   OFFICE OF THE UNITED STATES TRUSTEE
10 By:  Ms. Nancy Ratchford
   P.O. Box 1539
11 San Antonio, Texas  78295
   Appearing for the United States Trustee;

12

13 SMEBERG LAW FIRM, PLLC
   By:  Mr. Ronald J. Smeberg
14 11550 IH 10 West, Suite 180
   San Antonio, Texas  78230
15 Appearing for the Debtor.

16
                   * * * * * *
17

18

19

20

21

22

23

24

25

July 5, 2013,

1                          INDEX

2

3   WITNESSES FOR          Direct  Cross  Redirect  Recross
    THE DEBTOR
4
    Don Merrill, Jr.          8      19       40        43
5

6

7
    RULING OF THE COURT      60
8

9
                    * * * * * * * * * * * *
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Federal Court Reporters of San Antonio, Inc.
210-340-6464

July 5, 2013,

Page 4

1          COURTROOM DEPUTY:  All rise.

2          THE COURT:  Please be seated.  Good morning,

3    ladies and gentlemen.  We'll call our 9:30, cases.

4          COURTROOM DEPUTY:  Tootie Pie Company, Inc.

5          MR. SMEBERG:  Your Honor, Ron Smeberg for

6    the Debtor.

7          MS. RATCHFORD:  Nancy Ratchford for the

8    U.S. Trustee.  I will ask the Court to pardon me for

9    my casual attire.  I did not expect to be in court

10   this morning.

11         THE COURT:  Okay.

12         MR. OCHOA:  Good morning, your Honor.

13   Virgil Ochoa, of Gardere, on behalf of TCA Global

14   Credit Master Fund, LP.

15         THE COURT:  Okay.  We have one other case.

16   Do you have any idea how much time you will need?

17         MR. SMEBERG:  I suspect probably 30 to 45

18   minutes.

19         THE COURT:  Okay.  We'll come back to it in

20   just a minute.

21         (Other matters taken up.)

22         COURTROOM DEPUTY:  Tootie Pie Company, Inc.

23         MR. SMEBERG:  Your Honor, Ron Smeberg for

24   the Debtor again.

25         THE COURT:  Okay.  Do we have someone on the

July 5, 2013,

Page 5

1    telephone?

2           MS. O'NEIL:  Good morning, your Honor.  This

3    is Holland O'Neil, with the law firm of Gardere Wynne

4    Sewell.  I am a partner with Mr. Ochoa.  And in light

5    of the shortness of time, we scrambled to try to get

6    together, and Mr. Ochoa will be presenting some of the

7    arguments, and I would appreciate it if the Court

8    could indulge us to the extent I need to chime in to

9    add a -- fill in some of the blanks, just -- We've

10   been trying to catch up on the facts as quickly as

11   possible.  I would appreciate the Court's indulgence

12   for this expedited hearing.

13           THE COURT:  Okay.  That's fine.

14           MS. O'NEIL:  Thank you.

15           THE COURT:  Go ahead, Mr. Smeberg.

16           MR. SMEBERG:  Your Honor, this case was

17   filed on Wednesday, late in the day.  It was kind of a

18   "shotgun" filing.  The main reason for the filing is

19   there were threats to lock-out on two of these retail

20   stores.

21       This is the Tootie Pie Company.  They both

22   manufacture and distribute pies, and they have pie

23   cafes.

24       And, so, two stores had been already locked out

25   previously.  And so the reason for the "shotgun" quick

July 5, 2013,

Page 6

1  filing was to avoid the lock-out, and so they can get

2  on to their process of reorganization.

3       Before the Court today are two -- are really two

4  motions.  We have a DIP financing motion, and we also

5  have a motion to pay employee wages.  I don't think

6  I'm going to get a lot of push-back on the employee

7  motion.  I've already talked to the U.S. Trustee, and

8  talked to the counsel for TCA, and I think we can

9  agree who should and shouldn't get paid to keep the

10  operation going.  The issue really is going to be

11  whether the DIP financing -- And this is interim

12  financing--I know we have to set an order 14 days

13  out--will be a -- should they be administrative

14  priority, or not.

15       What I would like to do is put the president on

16  the stand, just so everyone can get a lay of the

17  land.  It would be better than me trying to proffer

18  it, because I just got this case late in the -- late

19  in the game, also.  And then -- And then see if the

20  Court finds it reasonable for the administrative

21  priority to be given to the short-term financing.

22            THE COURT:  Okay.  Mr. Ochoa, did you want

23  to make any statement to start out with, or just

24  listen to the Witness?

25            MR. OCHOA:  Your Honor, we'll -- we'll

July 5, 2013,

Page 7

1    listen to the Witness.

2              THE COURT:  Okay.

3              MR. OCHOA:  And we'll reserve our statements

4    for afterwards.

5              THE COURT:  All right.

6              MR. OCHOA:  Thank you.

7              THE COURT:  Go ahead.

8              MR. SMEBERG:  Don Merrill.

9              THE COURT:  Right up here, sir.  Just have a

10   seat.

11        And would you raise your right hand.

12        Do you solemnly swear the testimony you are about

13   to give will be the truth, the whole truth, and

14   nothing but the truth, so help you God?

15             THE WITNESS:  I do.

16             THE COURT:  Okay.  Would you give us your

17   name for the record and spell your last name?

18             THE WITNESS:  Do I need to speak into this?

19             THE COURT:  Into the microphone, yes.  We're

20   all -- It's all recorded.

21             THE WITNESS:  My name is Don Merrill, Jr.

22             THE COURT:  Okay.  Thank you.  How do you

23   spell your last name?

24             THE WITNESS:  M-E-R-R-I-L-L.

25             THE COURT:  Okay.  Go ahead.

July 5, 2013,

Page 8

1             MR. SMEBERG:   Thank you, your Honor.

2                    DIRECT EXAMINATION

3    BY MR. SMEBERG:

4    Q.    Mr. Merrill, what is your position with Tootie

5    Pie Company?

6    A.    President and CEO.

7    Q.    Can you give the Court a brief explanation as to

8    how Tootie Pie Company, Inc., started?

9    A.    Oh, sure.  Tootie Pie Company was started about

10   eight years ago.  We started from scratch.  Read a

11   story about Tootie--she's a real lady--and we formed a

12   company around her and her recipes, to sell her pies

13   to the public.

14   Q.    Now, you are a publicly traded company; correct?

15   A.    That's correct.

16   Q.    Can you just give the Court an explanation of:

17   When did you become publicly traded and how are you

18   traded?

19   A.    We became publicly traded in 2007, approximately

20   April.  And we are traded in the over-the-counter

21   markets, currently on the pink sheets.

22   Q.    Okay.  Give the Court a quick explanation as to

23   how the company grew, and how we kind of got to where

24   we are today.

25   A.    Okay.  Initially, before we went public, we did a

July 5, 2013,

Page 9

1    couple of private placements.  We raised a

2    half-a-million dollars, commenced operations in

3    Boerne, began selling the pies.  The pies sold really

4    well.  We got into wholesale distribution to grocery

5    and food service.  We raised another half-million

6    dollars privately, and expanded operations.  Then we

7    filed a registration with the Securities and Exchange

8    Commission in mid-2006, and it was -- we were cleared

9    for trading in January of 2007.  We went public at

10   that point, and then converted some warrants, which

11   brought in another million dollars.  And since then we

12   have raised close to $4 million, or so, with mostly

13   accredited investors.

14   Q.   Now, what's happened in the past two years that

15   has caused us to be at this point where we just filed

16   a Chapter 11 bankruptcy?  First, can you explain the

17   seasonality of your business?  How about that?

18   A.   Sure.  We're very similar to a typical retailer

19   in that we have to do most of our selling in the fall

20   months; the holiday season, that's when people think

21   about pie.  A couple of years ago we -- Coming out of

22   the recession, I guess three years ago, we were

23   struggling to survive.  And we -- we took a -- a risk,

24   really, to go into the cafes.

25        And we purchased our first cafe.  It was a --

July 5, 2013,

1    formerly a Benny's Bagles.  We purchased it for mostly

2    stock, and a little bit of cash, got into the cafe

3    operations.  And the purpose of that was just to try

4    to even out the seasonality of our business.

5         And it has improved over the last couple years.

6    Of course, in the beginning, we had no -- no good

7    quarters.  In the last couple years we've gone to

8    where we had one good quarter during the holidays.

9    And last year we had a couple of good quarters.

10        But we still struggle during the January-to-July

11   period, because people just don't buy as much pie.  We

12   also sell them online as corporate gifts.  People just

13   don't buy as much of them.  But we still have to make

14   them and build inventory.  And it causes us to have

15   negative cash-flow during that period.  We've always

16   had negative cash-flow during that period.

17        About April, last year, we were introduced to

18   TCA Global, and they quickly approved us for a

19   million-dollar line of credit.  We borrowed $350,000.

20   And it was a short-term line of credit, one-year

21   payback.  And then a couple, three months later, they

22   loaned us another $350,000.  And then through last

23   year we paid back approximately 300,000, or so, of

24   that, and then, you know, hit this period from January

25   to July of negative cash-flow again.

July 5, 2013,

Page 11

1          And I don't know how far you want me to go into

2     that part of the story.

3     Q.    I think that's good.    Thank you.

4     A.    Okay.

5     Q.    So, approximately -- I know there's a little bit

6     of a dispute, but approximately how much do you

7     believe is owed to TCA?

8     A.    Approximately 400,000.

9     Q.    Now, the reason we filed this bankruptcy today

10    was because it's my understanding that you received

11    notices from a couple of cafes that you were going to

12    be locked out?

13    A.    That's correct.

14    Q.    Now, have you asked TCA for additional funding or

15    loans to help get through this cycle?

16    A.    Repeatedly.

17    Q.    Have you gone to other lenders to try to receive

18    short-term or long-term funding to get you over this

19    hump?

20    A.    Yes, we have.

21    Q.    And what has been the response?

22    A.    No.    They -- They -- They, basically, have said

23    no.    The reasons given, primarily, were we had to

24    resolve the issue with TCA.

25    Q.    So, approximately how many different sources have

July 5, 2013,

Page 12

1    you sought out for lending?

2    A.    Oh, goodness.   Dozens.   You know, I've asked

3    individuals, I've asked friends, I've asked family,

4    I've asked -- we applied to our own bank.   Again, I

5    asked TCA.   We hired an investment banking firm in

6    February or March of this year, out of New York, to

7    help us find funding.   We have had -- You know,

8    original investors, we've gone to.   Any number of

9    different sources to try to find -- It's just -- It's

10   the nature of a small business, you know, you are

11   always looking for growth capital.

12   Q.    Over the last 120 days, how much money has been

13   put at risk in the company by shareholders and family

14   and friends of shareholders?

15   A.    Approximately 200,000.

16   Q.    And how about in the last six months?

17   A.    Over 300,000.

18   Q.    Okay.   And is TCA also a shareholder?

19   A.    They are.

20   Q.    Can you please take a look at Debtor's Exhibit 1,

21   which should be right there in front of you?

22   A.    Okay.

23   Q.    Have you had a chance to review Debtor's

24   Exhibit 1?

25   A.    Yes, I have.

July 5, 2013,

Page 13

1    Q.    Okay.  Can you explain to the Court what Debtor's

2    Exhibit 1 is?

3    A.    These are the rank-and-file -- some of the

4    rank-and-file cafe employees.

5    Q.    Is this what they are owed to date?

6    A.    Yes.

7    Q.    Now, the last page -- Flip over to the last page

8    real quick.  That's the page that says at the top,

9    Company, Tootie Pie Company, Incorporated; Report,

10   Payroll Details.

11   A.    Okay.

12   Q.    Now, there's one, two, three, four, five -- six

13   people on there.  You're on there, and you're an

14   insider; correct?

15   A.    Correct.

16   Q.    And then, also, we have on here David Strolle.

17   He's also an insider of the company?

18   A.    Correct.

19   Q.    Okay.  Now, as far as Stephen Gamboa, what's his

20   position?

21   A.    He is the only bookkeeper we currently have.

22   Q.    Is he an officer of the company?

23   A.    He is not.

24   Q.    Okay.  He's an employee of the company; correct?

25   A.    He is.  Correct.

July 5, 2013,

Page 14

1   Q.    And then, also, I see that you have Marcia

2   Chamberlain and Bobby Keese, K-E-E-S-E.  What are

3   their positions?

4   A.    Bakers.

5   Q.    Okay.  And what do they do for the company?

6   A.    Make the pies.

7   Q.    Okay.  So, is there anybody else to make pies,

8   other than them?

9   A.    There's a couple of other rank-and-file employees

10  that are listed somewhere in these documents, probably,

11  that also do that, as well.

12  Q.    Okay.  But they're the -- They kind of manage

13  that little group?

14  A.    Right.  Right.

15  Q.    Are they officers --

16  A.    They're the ones that know the recipes, and how

17  to do it.

18  Q.    Are they officers of the company?

19  A.    They are not.

20  Q.    Directors of the company?

21  A.    No.

22  Q.    So, other than you and David Strolle, is there

23  anybody on this payroll who's owed money today that is

24  an officer of the company, a manager of the company, a

25  director of the company, or otherwise an insider of

July 5, 2013,

Page 15

1    the company?

2    A.    There is not.

3    Q.    Okay.  All right.  We're just about done here.

4          Okay.  My understanding is that just -- What is

5    your fear if we do not pay the employees today?

6    A.    They'll walk out.  Every one of them.

7    Q.    Do the employees already have an idea that a

8    couple of the stores have closed?

9    A.    They do.

10   Q.    Okay.  And, so, if employees walk out, what's --

11   what do you -- what's your fear of what's going to

12   happen?

13   A.    We're out of business.

14   Q.    Okay.  Now, also my understanding is there's

15   some food that has been -- that has been ordered from

16   Ben E. King (sic) that has not been paid for but they

17   are holding the order for lack of payment; is that

18   correct?

19   A.    That's correct.

20   Q.    Do you know about how much the cost of that food

21   is?

22   A.    Let me see.  Today, it's a couple of thousand

23   bucks.

24   Q.    Is it less than $3,000?

25   A.    Yes.

July 5, 2013,

Page 16

1  Q.   Is that food necessary to either operate the

2  factory or operate the cafes?

3  A.   Absolutely.

4  Q.   If you don't get that food, what is your fear?

5  A.   Well, there won't be anything to sell in the

6  cafes.  You know, we sell things other than pie.  We

7  sell sandwiches and coffee and things.  And this is

8  food that has been sold already, you know, and so they

9  have to have it to make the sandwiches and -- and take

10  care of the customer.

11  Q.   Okay.  Now, my understanding is there's two

12  shareholders who have offered to provide some funding

13  to get us over this hump for the next 14 days; is that

14  correct?

15  A.   That's correct.

16  Q.   Who are the shareholders?

17  A.   Who are they?

18  Q.   Right.

19  A.   Dan Gostylo and Cliff Rogers.

20  Q.   Now, is it correct that between the two of them

21  they own approximately six percent of the company?

22  A.   At least.  Yes, that's correct.

23  Q.   Somewhere in the --

24  A.   Approximately.

25  Q.   Is it even close to that?

July 5, 2013,

Page 17

1   A.    Yes.  Yes, it is.

2   Q.    Okay.  Now, it's my understanding that Dan just

3   put in about $10,000 in the last week, into the

4   company; is that correct?

5   A.    That's correct.

6   Q.    In fact, he paid my retainer --

7   A.    He did.

8   Q.    -- of $6,200?

9   A.    Right.

10  Q.    And, then, $3,300 to Broadway Bank?

11  A.    The $3,300 that we put in -- We bank at Frost.

12  And the purpose of that was to give us the cash to

13  make the rent payment on our Broadway location, --

14  Q.    Okay.

15  A.    -- so that they would not lock us out there.

16  Q.    And has Dan or Cliff -- have they received any

17  money back from the company?

18  A.    No.

19  Q.    Do they owe the company any money?

20  A.    They do not.

21  Q.    Okay.  And just really quick, what is the

22  company's vision right now for how they're going to

23  successfully reorganize?

24  A.    Well, I -- From -- My background is finance, and

25  so in canvassing the different financial sources that

July 5, 2013,

Page 18

1    we had out there, we -- it became clear to us that --

2    that we had to resolve some of these issues with our

3    outstanding debt, and that if we were able to get that

4    resolved, and get it under control, that I think there

5    is a significant interest in providing capital to the

6    company on a going-forward basis.

7    Q.    Okay.  One more question about Dan and Cliff.

8    Are either of them officers of the company, president,

9    vice-president?

10   A.    They are both directors.

11   Q.    Both, board of directors?

12   A.    Yes, sir.

13   Q.    But they're not officers?

14   A.    They are not.

15   Q.    Okay.  And approximately -- Do you know

16   approximately how much the payroll is, in Debtor 1,

17   that needs to be paid?

18   A.    The cafe payroll is approximately 15,000.  And

19   then I think the Boerne rank-and-file, the bakers, and

20   those kind of folks, I think it's probably four to

21   five thousand.  So, approximately $20,000 for the

22   rank-and-file.  Not including me.

23   Q.    All right.

24   A.    That does not include me.

25   Q.    Okay.

July 5, 2013,

Page 19

1           MR. SMEBERG:  I'll pass the Witness, your

2     Honor.

3           THE COURT:  Mr. Ochoa, did you have any

4     questions?

5           MR. OCHOA:  Yes, your Honor, if I may.

6                      CROSS-EXAMINATION

7     BY MR. OCHOA:

8     Q.    Mr. Merrill, you mentioned a debt to my client,

9     TCA Global.  Are you aware whether TCA holds a

10    security interest?

11    A.    I don't know.

12    Q.    Okay.  Would it surprise you to learn that TCA

13    has filed -- has asserted that they are secured on all

14    the Debtor's assets?

15    A.    It would not surprise me.

16    Q.    Okay.  You mentioned also that you have sought

17    out dozens of family and friend -- and friends to get

18    additional financing.  How many banks did you

19    contact?

20    A.    Well, when you say "banks," are you talking about

21    investment banking firms or just, like, depository

22    banks?

23    Q.    Both.

24    A.    In what period of time?

25    Q.    In the last six months.

July 5, 2013,

Page 20

1    A.    In the last six months?  Oh, four or five.

2    Q.    And have there been significant changes in the

3    payroll in the last six months?

4    A.    It's gone down considerably.

5    Q.    How about in other operating expenses?

6    A.    They have been reduced considerably, as well.

7    Q.    So, primarily, you're -- at this point, you're

8    asking for financing in order to keep the stores open;

9    correct?

10   A.    That's correct.

11   Q.    And you have requested $50,000 in financing;

12   correct?

13   A.    That's correct.

14   Q.    But you just testified that payroll -- current

15   payroll is about $2,000, and I think there was another

16   $3,000 payment that's due?  Is that accurate?

17   A.    No, I said that current payroll is approximately

18   20,000.

19   Q.    Uh-huh.

20   A.    Okay?

21   Q.    And there's about another $3,000 that's due

22   immediately?

23   A.    In food bills.  That's correct.

24   Q.    To Ben E. King (sic)?

25   A.    It's actually Ben E. Keith, but yes.

July 5, 2013,

Page 21

 1   Q.    Oh, Ben E. Keith.  Sorry.

 2   A.    That's okay.

 3   Q.    So, the actual amount to get you through the

 4   short-term, next 14 to next 30 days, is about

 5   $23,000?

 6   A.    No.  No, I think it's more than that.  You've got

 7   rent, rent payments for cafe locations.  I think

 8   50,000 is conservative.

 9   Q.    Fifty thousand to get you through the next two

10   weeks?

11   A.    Next 30 days.

12   Q.    Next 30 days?

13   A.    Right.

14   Q.    And have you provided a budget, at this point, in

15   conjunction with the lending?

16   A.    I'm not sure what all has been provided.  We've

17   provided a lot of -- a lot of information.  I'm not

18   sure what all has been provided.

19   Q.    Have you worked on -- out a budget for the next

20   30 days?

21   A.    On a budget for the next 30 days?

22   Q.    Yes.

23   A.    You know, we have an ongoing 30-day budget, yes.

24   Q.    Okay.  Thank you.

25         MR. OCHOA:  No further questions, your

July 5, 2013,

Page 22

1    Honor.

2              THE COURT:  Ms. Ratchford?

3              MS. O'NEIL:  Your Honor, would it be

4    possible for me to ask the Witness just a couple of

5    questions?

6              THE COURT:  Sure.

7              MS. O'NEIL:  Again, I apologize.  But if the

8    Court could indulge us on the short notice.

9              THE COURT:  Go ahead.

10             MS. O'NEIL:  Thank you, your Honor.

11                  FURTHER CROSS-EXAMINATION

12   BY MS. O'NEIL:

13   Q.   Mr. Merrill, how long have you been the president

14   and CEO of the Debtor?

15   A.   Since its inception.

16   Q.   And, Mr. Merrill, is it your testimony that

17   you -- Let me -- Well, let me ask you this way.

18        Were you involved with the transaction,

19   approximately a year ago, with TCA?

20   A.   Yes.

21   Q.   Is it your testimony, as the President and CEO,

22   that you were unaware of whether the Debtor had agreed

23   to pledge all of their assets to TCA?

24   A.   That I was unaware?  I'm not sure.  Can you --

25   Q.   If, in response to Mr. Ochoa's question, you

July 5, 2013,

Page 23

1    stated that you did not know if TCA, my client, is

2    secured or unsecured, is that your testimony?

3    A.    That's correct.

4    Q.    And are you saying that despite being the

5    President and CEO, and being involved in the

6    transaction a year ago, that you are unaware that the

7    Debtor -- whether the Debtor had pledged its assets to

8    TCA?

9    A.    Well, I'm -- I'm not -- I'm not an attorney, so I

10   don't know what -- There has been some question about

11   whether they had secured their interest or not, the

12   lender.

13   Q.    So, what you're saying, despite being the

14   President and CEO, you do not know the answer to that

15   question?

16   A.    I do not know the answer to that question.

17   Q.    Okay.  Mr. Merrill, you have not provided any

18   information to the creditors about the cash position

19   of the company.  Can you explain what the financial

20   condition of the company is at present?

21   A.    The current cash position today is approximately

22   $2,600.

23   Q.    And is that -- is that typical for this time of

24   the year, that you would have only $2,600?

25   A.    Yes.

July 5, 2013,

Page 24

1    Q.    And at the time that you entered into the loan

2    transaction with my client, were you aware of the

3    cyclical nature of the cash?

4    A.    Yes.

5    Q.    But, nonetheless, on behalf of the Debtor, you

6    entered into a loan transaction that would require

7    payments during that period of time?

8    A.    Yes.

9    Q.    Okay.  Your pleadings, sir, did not request

10   additional payments for food and other vendors.  Are

11   you -- Is it your testimony that you are requesting

12   authorization to use funds to pay expenses other than

13   payroll?

14   A.    Just food.

15   Q.    And is it solely to the vendor, Ben E. Keith?

16   A.    I don't -- I don't think so.  I'm not real sure

17   what we are allowed to pay, and so I -- you know, I

18   mean, I don't know how much will get approved to pay

19   today.  And, so, when I speak ignorantly of what we

20   may be able to pay, it's because I am ignorant of what

21   we might be able to pay.

22   Q.    Did you review the pleadings that were filed by

23   your counsel for the -- requesting the release you

24   are -- you are testifying for today?

25   A.    As -- As best as I can, from a layman's

July 5, 2013,

Page 25

1   perspective.

2   Q.    Okay.  And do you know whether additional

3   expenses, beyond payroll, were requested?

4   A.    Specifically, I do not.

5   Q.    Okay.  You testified that your -- the insiders

6   that are being proposed to pay -- or to provide the

7   DIP financing have previously provided funds in the

8   last few weeks to the Debtor; is that accurate?

9   A.    That's correct.

10  Q.    Okay.  And in providing those funds, you

11  stated--if I could get your testimony; I don't mean to

12  put words in your mouth--but I think you said that

13  they had offered -- or offered to pay -- My -- My

14  question to you, sir, is:  Were those funds a loan to

15  the company, or were those capital contributions by

16  those shareholders?

17  A.    I think they were envisioned to be loans,

18  although I think that -- You know, I think they were

19  envisioned to be loans.  I didn't actually say that.

20  I think our -- our attorney volunteered the dollar

21  amounts.  But I don't dispute those dollar amounts,

22  they were accurate, that -- that one -- one of our

23  investors and board members has provided approximately

24  $10,000 in the last week, or so; 6,000 to pay for our

25  attorney, and a little over $3,000 that was meant to

July 5, 2013,

Page 26

1    pay the rent to keep one of the locations open.

2    Q.   And when you say "provided," that's -- that's

3    what I'm trying to get clarity on, was how -- Were --

4    Was a loan document signed, at that time, with that

5    insider?

6    A.   No.  They -- He wrote a check, and on the check

7    he wrote a short-term loan, I believe, in the memo

8    section.

9    Q.   And, so, even -- You have acknowledged that this

10   company is a publicly traded company; is that correct?

11   A.   That's correct.

12   Q.   And was there an 8-K filed in conjunction with

13   those loans?

14   A.   No.

15   Q.   Do you know what an 8-K is, sir?

16   A.   I do.

17   Q.   Okay.  And would it be fair to say that if there

18   are significant transactions or material events with

19   the company, that it is appropriate for a public

20   company to file an 8-K?

21   A.   That -- In -- In general, that that's what is --

22   I'm not a securities attorney, so I don't know what

23   all would constitute...

24   Q.   I'm just asking for your understanding.

25   A.   Okay.  You're asking my opinion that:  Are there

July 5, 2013,

Page 27

1    events when, this week, that have occurred that would

2    be --

3    Q.    Just generally speaking, sir.  I'm sorry.

4    A.    Well, an 8-K, as you may be aware, is -- is

5    required, as I understand it, to be filed within five

6    business days of when a material event -- I don't know

7    which -- what all the material events are that would

8    constitute what would be covered under an 8-K.  But I

9    think that our understanding is that filing Chapter 11

10   would likely require that we file an 8-K within five

11   days of the -- business days of the filing.  And --

12   And -- And, at this point, that would be our plan.

13   Q.    Thank you.  And -- And, Mr. Merrill, has the

14   Debtor -- has the Debtor been in default with my

15   client for some time?

16   A.    Has the Debtor been in default?  We -- We have a

17   disputed claim with your client.

18   Q.    Have you -- The company received a notice of

19   default in -- from my client?

20   A.    That's part of our dispute.

21   Q.    Okay.  I'm sorry, sir.  That's just a "yes" or

22   "no" question.

23        Has the company received a notice of default from

24   my client?

25   A.    No.

July 5, 2013,

Page 28

1   Q.   Has the -- It's your testimony you have not

2   received a notice of default?

3   A.    Our -- We have litigation in Florida.   Our

4   position is that we were not properly noticed.

5   Q.    And yet -- So -- And you acknowledge, though, you

6   have had pending litigation in Florida for some period

7   of time; is that correct?

8   A.    That's correct.

9   Q.    And has an 8-K been filed with regards to either

10  that litigation or the default alleged by my client?

11  A.    No.

12  Q.    All right.  Is it --

13          MS. O'NEIL:   Strike that.

14  Q.    (By Ms. O'Neil)  Mr. Merrill, when were the terms

15  of the proposed DIP financing negotiated with the

16  insiders?

17  A.    The terms for which debt financing?

18  Q.    Your -- The -- I'm sorry.  DIP, the financing

19  that you're requesting before the Court today, the DIP

20  financing.

21  A.    I think that our -- we were provided with some

22  general documents to -- that I -- I think are probably

23  part of the bankruptcy filing.  And we -- we just got

24  those Wednesday sometime.

25  Q.    And who provided those documents?

July 5, 2013,

Page 29

1    A.    Our attorney.

2    Q.    My question was:  When were the terms negotiated

3    with these insiders?

4    A.    I -- I don't know -- I think these -- this was

5    just given to us, and -- and that was accepted as the

6    terms.  There, really, was no negotiation.

7    Q.    There was no negotiation of the terms with these

8    insiders?

9    A.    Correct.

10   Q.    Have you reviewed the terms of the credit

11   facility that was attached to the motion that your

12   lawyer filed?

13   A.    Have I reviewed the terms of the...  Is that

14   the -- Is that the note that the -- the two investors

15   would -- ideally would sign?

16   Q.    Mr. Merrill, attached to your motion was a credit

17   facility document that you were proposing to have the

18   Debtor execute in conjunction with this request before

19   the Court.  It's entitled "Debtor-In-Possession

20   Revolving Credit Agreement," and it is 24 pages long.

21   Have you reviewed that document?

22   A.    Oh, okay.  I -- I did a very quick cursory

23   review.

24   Q.    And you're the -- you're the President and CEO of

25   this Debtor, and having done only a cursory review,

July 5, 2013,

Page 30

1    you're asking the Court today to approve and authorize

2    you to proceed with executing this document?

3    A.    Under the circumstances, yes.

4    Q.    Even though you have not specifically read the

5    terms of the document, you've -- you're -- It's your

6    testimony you've just done a cursory review?

7    A.    I have done a cursory review.  It looked like a

8    fairly standard loan document.

9    Q.    Sir, do you know when this loan is -- If the

10   Court grants the Debtor's request today, do you know

11   when the loan is to be repaid?

12   A.    If I recall, I believe it's six months.

13            MS. O'NEIL:  Your Honor, the document is

14   attached to the pleading.  I don't know if the Witness

15   has it.

16   Q.    (By Ms. O'Neil)  But if I -- if I may restate.

17   In the document, under the definition of Commitment

18   Termination Date, it provides it shall be the earliest

19   of the maturity date or 30 days after entry of the

20   order by the Bankruptcy Court.  There are two other

21   provisions.  But pursuant to this definition it says

22   30 days after entry of the order.  Were you aware of

23   that term?

24   A.    Thirty days, that the money would be provided, or

25   30 days that the -- it would be repaid?

July 5, 2013,

Page 31

1   Q.    That is the commitment termination date.

2   A.    Well, "termination date" would mean that if

3   the -- if the loan wasn't executed, that it would --

4   the offer would terminate in 30 days?

5   Q.    Sir, I'm -- I just received these documents.

6   Purportedly, you negotiated them, or the Debtor is

7   proposing to enter into them.  I'm asking you, from

8   your understanding of what the terms are.

9   A.    My understanding was that it would be a six-month

10  term.  But I -- You know, I -- I don't know what --

11  So, I don't know what the 30-day provision is.

12  Q.    Are you -- Do you know what -- the interest rate

13  that is being offered on -- on this loan?

14  A.    I believe it was 12.

15  Q.    If -- Paragraph 2.5 of the note references that

16  the loan will bear interest at the rate of seven

17  percent, but it -- then in parentheses it says

18  12 percent.  So, I'm -- I have some confusion about

19  what the interest rate is.  But it's your

20  understanding it's 12 percent?

21  A.    That's what I recall.

22  Q.    And did you -- did you negotiate that, at

23  arms-length, with the insiders, as to what that rate

24  would be?

25  A.    I -- I am not sure what -- I don't know what

July 5, 2013,

Page 32

1    the -- how to answer that question.

2    Q.    Let me try it again.  Did you negotiate the

3    interest rate with these insiders?

4    A.    I did not.

5    Q.    Okay.  Did you negotiate any terms of this credit

6    agreement with the insiders?

7    A.    I -- I believe I already answered that I did not

8    negotiate it, that we just -- we were provided a loan

9    document from our attorney that -- and I was asked to

10   look at it and make sure the names are correct, and

11   that we were just trying to get these things done

12   quickly.  And, so, there really was no opportunity for

13   negotiation in the short period of time.

14   Q.    Okay.  What was the -- What was the basis for

15   needing to get this done quickly?  You testified

16   earlier, I think, that there was some rent that was

17   coming due, or threat of a lock-out; is that correct?

18   A.    There was a -- That was one of the reasons.

19   We -- Threat of a lock-out for rent.  Also to pay the

20   employees.  To -- To --

21   Q.    Sir, do you -- do you typically pay rent at the

22   first of each month?

23   A.    Typically.

24   Q.    And how far in arrears is the Debtor on rent

25   payments?

July 5, 2013,

Page 33

1    A.    On average, one month.

2    Q.    And, so, is that -- for those facilities that

3    were going to be locked out, are those landlords only

4    owed one month's rent?

5    A.    Let's see.  The two San Antonio locations are one

6    month.  The Austin -- One of the Austin locations is

7    one month, and the other Austin location is two

8    months.

9    Q.    And the -- What you're -- Your testimony is

10   that's how far in arrears that the Debtor is at this

11   time?

12   A.    On rents on those locations, yes.

13   Q.    Okay.  And did you receive a written threat of a

14   lock-out at the stores?

15   A.    Yes.

16   Q.    And that was after just one month's arrears?

17   A.    Yes.  We get a default notice pretty quickly.

18   Q.    And it's your testimony -- When did you

19   receive --

20            MS. O'NEIL:  Strike that.

21   Q.    (By Ms. O'Neil)  When did you receive the default

22   notice?

23   A.    Which location?

24   Q.    Well, let's start with the locations that were

25   threatening the lock-outs.

July 5, 2013,

Page 34

 1   A.    That was somewhere towards the end of June.

 2   Q.    And what was the Debtor's plan for payment of

 3   those rent payments?

 4   A.    To continue to try to take the limited amount of

 5   cash-flow that existed and pay rents on the squeakiest

 6   wheel, as best as possible, subject to finding any

 7   external funding, which I had -- felt like I had

 8   searched exhaustively to find.

 9   Q.    I think your testimony earlier was that the

10   Debtor currently has approximately $2,600 in cash; is

11   that correct?

12   A.    That's correct.

13   Q.    And I -- I think your testimony was also that

14   that was a typical cash position for this time of the

15   year; is that correct?

16   A.    On any given day, it could be -- that could be

17   the amount, yes.

18   Q.    So what -- In this particular instance, what has

19   caused the liquidity crisis and inability to pay rent,

20   when historically you have had this cash-flow crunch

21   at this time of the year in the past that has not

22   caused the landlords to issue default notices and

23   things of this nature?  What's the -- What's -- What's

24   different now?

25   A.    I think that pretty-well summarizes why it is

July 5, 2013,

Page 35

1    now, what you've just said.

2    Q.    I'm sorry if I'm not being clear.  I think -- I

3    thought your testimony was this was typical for this

4    time of the year in the past.

5    A.    It is typical to be experiencing significant

6    negative cash-flow during this time of the year.

7    Q.    And how have you, in -- since you're -- I believe

8    you said you have been there for eight years.  How

9    have you dealt with the payment of expenses during

10   this particular period of time when you're at your

11   lowest cash point?

12   A.    I do what I've tried to do this year, every

13   year; I've borrowed money from your client, I've

14   borrowed -- I've sought equity infusions from outside

15   investors, I've put money in myself.  You know,

16   I've -- Wherever -- Any type of opportunity I can to

17   find the money, I try to find it and get it in there.

18   We've borrowed from shareholders in the past.  We've

19   gotten equity infusions from shareholders.  Like I

20   said, we hired investment banks.  You know, any --

21   It's just, this -- this is the nature of the business

22   this time of year.

23   Q.    But, sir, you're acknowledging that you're -- you

24   have, obviously, substantially more debts than the

25   Debtor has the ability to pay; is that correct?

July 5, 2013,

Page 36

1   A.    That's correct.

2   Q.    And do you have an opinion on -- as to the value

3   of the assets of the Debtor?

4   A.    I do not.

5   Q.    Do you think the assets -- the value of the

6   assets exceed the debts owed to the creditors?

7   A.    Exceed the debt of the creditors?  I wouldn't

8   think so.

9          MS. O'NEIL:  Your Honor, I have no further

10  questions.  Thank you.

11         THE COURT:  Okay.  Ms. Ratchford?

12         MS. RATCHFORD:  Nancy Ratchford, for the

13  U.S. Trustee.

14                  CROSS-EXAMINATION

15  BY MS. RATCHFORD:

16  Q.    Mr. Merrill, we haven't met before.  I do have

17  some questions for you.

18         You didn't provide a budget with the request to

19  the Court, did you?

20  A.    I did not.

21  Q.    Did you provide a cash-flow statement with the

22  request to the Court?

23  A.    I did not.

24  Q.    And you answered earlier that there was no

25  negotiation of the terms of the facility; correct?

July 5, 2013,

Page 37

1    A.    That's correct.

2    Q.    And you said that the monies that Mr. Rogers or

3    Mr. Gostylo advanced prior to bankruptcy, some of

4    those monies were used to pay counsel, Mr. Smeberg?

5    A.    Yes.

6    Q.    And you answered earlier that that counsel

7    provided these documents.  Was that correct?  You said

8    your attorney?

9    A.    The loan documents, yes, ma'am.

10   Q.    So, that was Mr. Smeberg also?

11   A.    Yes.

12   Q.    How much money would the company collect in the

13   next 30 days?

14   A.    In -- In total sales?

15   Q.    Yes.

16   A.    Approximately a hundred thousand, assuming all

17   the locations remained open.

18   Q.    And you said earlier the Ben E. Keith amount, you

19   said, if I got your answer correctly, that food was

20   sold already?  Does that mean -- What does that mean?

21   A.    Well, we -- The cafes sell the food, and then we

22   put in another grocery order, and Ben E. Keith

23   delivers their --

24              (Sneeze.)

25              THE WITNESS:  Bless you.

July 5, 2013,

Page 38

1    A.    -- delivers their groceries.

2    Q.    (By Ms. Ratchford)   So, there are terms -- There

3    is a contract or a contractual agreement with Ben E.

4    Keith and the company?

5    A.    I -- Yes, ma'am, I think that's true.

6    Q.    And the order for the food, the $3,000, that's

7    already been placed; correct?

8    A.    It has been placed, yes.

9    Q.    And it was placed before or sometime during this

10   week or last week?

11   A.    This week.  We get weekly grocery deliveries.

12   Q.    And the order was placed on or before July 3rd?

13   A.    Yes.  I think that's right.  By the cafe

14   managers.

15   Q.    Do you owe the company any money?

16   A.    I do not.

17   Q.    Are there any outstanding unfunded payments due

18   from shareholders or management to the company as of

19   today?

20   A.    No, ma'am.

21   Q.    And are you -- You're not familiar with the terms

22   of the revolving line of credit, if I understood your

23   answer, you just generally reviewed them?

24   A.    Yes, ma'am.  That's correct.

25   Q.    So, you wouldn't know if the terms of the

July 5, 2013,

Page 39

1    revolving agreement limit the Debtor's ability to sell

2    certain assets?  You wouldn't know that?

3    A.    Not specifically, no.

4    Q.    And you wouldn't know that the payment of

5    prepetition obligations would be an event of default;

6    would that be correct?  You didn't know that?

7    A.    I'm not sure exactly what that means, so...

8    Q.    You just don't know?

9    A.    Correct.

10   Q.    And you wouldn't be aware, then also, would you,

11   that the terms of the agreement would prevent suits

12   against the insiders?  You wouldn't know that?

13   A.    I would not.

14   Q.    Are there any other entities to which the company

15   owes what are known as "administrative expense

16   obligations"?

17   A.    I'm not sure.  Is that -- I'm not sure what that

18   means, exactly.  I mean, we do owe other entities

19   money.

20   Q.    So, there might --

21   A.    But nothing --

22   Q.    -- there might be other claims out there that

23   might qualify as administrative expenses, you just

24   don't know?

25   A.    Correct.

July 5, 2013,

Page 40

1    Q.    And would it be correct, based on your earlier

2    answers, nobody went back to Mr. Gostylo or Mr. Rogers

3    and asked them to simply advance more monies on a

4    short-term loan or unsecured loan basis?

5    A.    That would -- That would be correct.

6          MS. RATCHFORD:  That's all I have.  Thank

7    you, your Honor.

8          THE COURT:  Further questions?

9          MR. SMEBERG:  Just a real quick Redirect,

10   your Honor.

11            REDIRECT EXAMINATION

12   BY MR. SMEBERG:

13   Q.    In regard to the last question by the U.S.

14   Trustee, do you understand or do you have an

15   understanding of -- I want to make sure you understand

16   what you've answered, is where I'm going at with

17   this.

18   A.    Okay.

19   Q.    Do you understand from the shareholders -- And

20   they're here, we have one of them here, and a

21   representative is here for the other one.  Are they

22   willing to advance the money if it's not given some

23   type of administrative priority?

24   A.    That's my understanding, yes.

25   Q.    That they're not willing to?

July 5, 2013,

Page 41

1    A.    Correct.

2    Q.    Okay.  There's been a lot of talk about

3    negotiating on terms of the contract.  So, at

4    2:00 o'clock on Wednesday afternoon, is it correct

5    that I was requested to put together an agreement for

6    financing?

7    A.    Correct.

8    Q.    And you had asked to make it fair to both the

9    shareholder and the company?

10   A.    Correct.

11   Q.    Okay.  And then -- And so you asked me to put

12   that together, and then I sent it to you to look at.

13   And that was probably about 3:00 o'clock; is that

14   correct?

15   A.    That's correct.

16   Q.    Okay.  There were some questions earlier about

17   the fact that you're really short of cash-flow in the

18   summer period of time.  Now, when you took out your

19   loan with TCA, were you anticipating growth in the

20   company?

21   A.    Yes.

22   Q.    And what were you anticipating the growth to come

23   from?

24   A.    From additional cafes and increased seasonal

25   sales, as -- as a result of already having had cafes

July 5, 2013,

Page 42

1    that we had acquired -- had acquired previously.

2    Q.    Okay.  Generally speaking, on the -- on the terms

3    you understand about the agreement--and I know there's

4    a lot of boilerplate in the agreement, and I've had a

5    lot of discussion with the U.S. Trustee about what

6    needs to be taken out of that agreement--but the

7    general terms of the -- the payment terms, on

8    agreement of 12 percent interest, payments beginning

9    in October, final payments caught up at the end of

10   January, do you believe those terms are fair and

11   reasonable to the company under these circumstances?

12   A.    Absolutely.

13   Q.    And what's the interest rate that TCA's note has

14   on it?

15   A.    The stated interest rate is 11, but the actual

16   interest rate is significantly higher than that.

17   Q.    Approximately what is their interest rate?

18   A.    I think they -- they have calculated it to be in

19   the low 20s.

20   Q.    And that was before you got into bankruptcy; is

21   that correct?

22   A.    Correct.

23   Q.    Do you know, in the litigation that TCA has

24   filed, have they alleged in their pleadings any

25   dishonesty, fraud or mismanagement against any of the

July 5, 2013,

Page 43

1    shareholders or directors?

2    A.    No.

3              MR. SMEBERG:  Thank you.  I pass the

4    Witness.

5              THE COURT:  Any further questions,

6    Mr. Ochoa?

7              MR. OCHOA:  Just a couple, your Honor.

8                    RECROSS-EXAMINATION

9    BY MR. OCHOA:

10   Q.    With regard to the payments that would be made to

11   the insiders, how do you anticipate making those

12   payments?  Where would the funds come from?

13   A.    Okay.  You're talking about how would we repay

14   the loan --

15   Q.    Uh-huh.

16   A.    -- that we're --

17   Q.    Yes.

18   A.    -- discussing today, the DIP, as it's called,

19   loan?

20   Q.    Yes.

21   A.    I think it would be the hope that the holiday

22   season and the resumption of the holiday season would

23   give us the amount of free -- some free cash-flow to

24   be able to repay them, especially coming out of

25   bankruptcy, where, presumably, our debt would be

July 5, 2013,

Page 44

1    restructured.

2    Q.    Okay.  So, from sales of pies, basically, from

3    the operating --

4    A.    Honestly, I think I would continue to do what I

5    always have.  Yes, we would be doing sales.  I would

6    continue to look for outside capital, additional

7    investors, other lenders.  It's -- It's been a

8    constant search for funding for eight years.

9    Q.    And to the extent that payments are made from the

10   sales, if TCA is secured, do you understand that that

11   would -- those payments would be coming from TCA's

12   cash collateral?

13   A.    Well, those are -- I think that's to be

14   determined through these proceedings.  So, I really

15   don't know how to answer that.

16   Q.    Okay.  Thank you.

17   A.    Uh-huh.

18          THE COURT:  Ms. Ratchford, any further

19   questions?

20          MS. RATCHFORD:  No further questions,

21   your Honor.

22          THE COURT:  Okay.  All right.  You can step

23   down.

24      Any other witnesses, Mr. Smeberg?

25          MR. SMEBERG:  No, your Honor.

July 5, 2013,

Page 45

1          THE COURT:  Okay.  Mr. Ochoa, did you have

2     any witnesses?

3          MR. OCHOA:  No, your Honor.

4          THE COURT:  Okay.  Ms. Ratchford?

5          MS. RATCHFORD:  No, your Honor.

6          THE COURT:  Okay.  All right.  You want to

7     briefly summarize your position on this, Mr. Smeberg?

8          MR. SMEBERG:  Your Honor, first of all, in

9     regard to the agreement, I met with the U.S. Trustee

10    beforehand; I spoke briefly with TCA.  I understand

11    there are some terms in there that could not possibly

12    be entered by the Court on a final basis today.

13         THE COURT:  Which agreement?  You have got

14    cash collateral, and you have also got employee

15    compensation.

16         MR. SMEBERG:  I'm talking about just the DIP

17    financing --

18         THE COURT:  Okay.

19         MR. SMEBERG:  -- agreement at this point.  I

20    mean, there's some terms -- And I understand those

21    objections.  At the end of the day, they're just

22    looking for basic administrative priority on the cash

23    that is brought in now, with the payment plan set up.

24    I have no problem paring down the agreement to what

25    they believe is fair.  We can take out the -- the

July 5, 2013,

Page 46

1  ability to prevent the sale of assets, things of that

2  issue.  They're not looking for superpriority.  And

3  they're even willing to put in a clause there that, to

4  the extent there are avoidance actions or -- or other

5  actions against the shareholders, they can be offset

6  by the amount of the loan.  So, we're not trying to --

7  So, we can take away the ability -- any type of

8  prevention of the insiders from putting money in, from

9  being sued, or those issues.  We don't believe they're

10  there anyway, so we don't feel we're even giving up

11  that much.

12      In regard to TCA, TCA is a shareholder of the

13  company, as well.  And, so, what they're basically

14  trying to say is, you can put your money in, and you

15  can save TCA, who is going to lose their pants if

16  these stores close, and they know they're going to

17  lose their pants, and all the other shareholders, we

18  want this six percent -- these six percent

19  shareholders to come in and save the company for

20  everybody else, but we don't want to give them any --

21  we don't want to give them any type of priority for

22  it.

23      All we're saying is, look, let's get over this

24  hump.  Fourteen days from now we can come back and we

25  can talk about whether any other funding should be

July 5, 2013,

Page 47

1    justified or not.  But let's not let the employees

2    leave and let's not let the doors close.

3        This company revenued approximately $3 million in

4    the last fiscal year.  If it takes $23,000 to keep the

5    food coming and keep the employees paid over the next

6    two weeks, I don't think that's out of line.  I know

7    they're shareholders, I know they're insiders, but so

8    is TCA and all these other people.  They're not the

9    ones who came up to step up to the plate.  These

10   particular two shareholders did.

11       And, so, it makes sense to say, look, you can

12   have a reasonable interest rate, we'll give you

13   administrative priority, we'll pare down the

14   agreement.  And I think that's a fair resolution to

15   keep this company afloat.  Because I know TCA -- what

16   they're hoping is that it'll get denied, and somebody

17   will step up to the plate.  But if that doesn't

18   happen, they may get $100,000 of assets out of it, but

19   they're going to lose their pants on the rest of the

20   loan, and everybody else is going to be out.

21              THE COURT:  How often is payroll?  Is it

22   weekly, twice a month?

23              MR. SMEBERG:  It's on the 5th and 20th of

24   each month.

25              THE COURT:  Twice a month.

July 5, 2013,

Page 48

1          MR. SMEBERG:  So, the next one would be on

2    the 20th.  Yes, your Honor.

3          THE COURT:  So, today.

4          MR. SMEBERG:  Today.

5          THE COURT:  And then two weeks, basically,

6    from today, or somewhere thereabouts.

7          MR. SMEBERG:  Fifteen days, your Honor.

8          THE COURT:  Okay.  So, will this make one

9    payroll or two payrolls?

10          MR. SMEBERG:  This is going to make one

11    payroll.

12      What I envision happening, and I mentioned this

13    to TCA's attorney, is we're going to have to file a

14    cash collateral motion based on--and they have

15    presented information showing that they likely are

16    secured; I'm not going to concede that, but from what

17    I've seen it looks like they probably are

18    secured--file a cash collateral motion, pay them

19    adequate protection.

20      Money is going to be coming in from the

21    business.  The cafes are operating.  They're selling

22    pies.

23      And so -- I mean, TCA, I don't think they're

24    going to argue that it makes sense for us to shut down

25    the business, because they're going to lose a lot more

July 5, 2013,

Page 49

1    in a liquidation than they're ever going to lose if we

2    actually keep the company operating.  They may argue

3    today, I don't think -- I think we can come to a

4    reasonable cash collateral agreement.

5              THE COURT:  Okay.

6              MR. SMEBERG:  But if not, we'll be back

7    in --

8              THE COURT:  So, you're not going to use cash

9    collateral, and you're just going to use these loan

10   proceeds?

11             MR. SMEBERG:  Just for right now, --

12             THE COURT:  Okay.

13             MR. SMEBERG:  -- until we get the motion on

14   file and work something out.

15             THE COURT:  Okay.  And, then, you're going

16   to make one payroll, which is 20,000, plus about 3,000

17   in food.  You don't have any other obligations, such

18   as rent, utilities, other food expenses, between now

19   and two weeks from now?

20             MR. SMEBERG:  I don't see the rent being a

21   problem until the first of the next month.

22             THE COURT:  Okay.

23             MR. SMEBERG:  I do see utilities.  I'm going

24   to talk to Bess Smith about CPS.  I think we can work

25   something out there.

July 5, 2013,

Page 50

1           THE COURT:  Okay.

2           MR. SMEBERG:  I'm not sure about the

3    utilities up in Dallas yet.  I haven't got that far.

4           THE COURT:  Okay.

5           MR. SMEBERG:  But I don't think we're going

6    to have a problem in the next 14 days.  In the next 30

7    days, I could see there being an issue.  But I think

8    we'll be okay for the next 14, especially if we can

9    get a reasonable cash collateral order in place,

10   interim, in the meantime.

11          THE COURT:  Okay.  The reset date we were

12   given--this is Judge Gargotta's case; I'm just

13   covering for him today--was the 22nd.  That's after

14   your payroll.  So, you need something before the 19th,

15   is that what you're saying, or the 20th?

16          MR. SMEBERG:  If we are going to borrow more

17   money, then we would probably have to try to have a

18   hearing on the -- I guess it would be the --

19          THE COURT:  Well, if you've got fifty, why

20   couldn't you make two payrolls with that fifty?

21          MR. SMEBERG:  If we got fifty, we could make

22   two payrolls from that, --

23          THE COURT:  Oh, you're saying that --

24          MR. SMEBERG:  -- which is what we're

25   asking --

Federal Court Reporters of San Antonio, Inc.
210-340-6464

July 5, 2013,

Page 51

1            THE COURT:  -- that they want you to take
2    less than fifty?
3            MR. SMEBERG:  Right.
4            THE COURT:  Okay.
5            MR. SMEBERG:  What they're saying is, look,
6    let's just go and --
7            THE COURT:  Go twenty-three.
8            MR. SMEBERG  The Code -- The Code -- I mean,
9    I think the Code backs them up on that.  We're only
10   supposed to take the minimum amount necessary --
11           THE COURT:  Right.
12           MR. SMEBERG:  -- for the 14 days.  So, I...
13           THE COURT:  Okay.
14           MR. SMEBERG:  But it does mean we need to
15   get back here before then.
16           THE COURT:  Okay.  And then another payroll
17   is due, about another 20,000, on the 20th?
18           MR. SMEBERG:  Yes, sir.
19           THE COURT:  Okay.  What about food purchases
20   between now and the 20th?
21           MR. SMEBERG:  If you'll -- If you don't mind
22   me asking the Witness really quick.
23           THE COURT:  Sure.  Go ahead.
24           THE WITNESS:  It's about 3,000 a week.
25           MR. SMEBERG:  Three thousand a week.  Okay.

July 5, 2013,

Page 52

1       Now, do you think you'll get money in to cover

2   that, so that we can work out a cash collateral

3   payment?

4            THE WITNESS:  I think the fifty would

5   represent the shortfall between what we get in versus

6   what we are obligated to pay.

7            MR. SMEBERG:  Do you know if the lender --

8   lenders would be, ultimately, willing to go that

9   high?

10           THE COURT:  Well, I mean, they're claiming

11  cash collateral.  He's using the money that's coming

12  in, in the next two weeks, and you haven't filed a

13  cash collateral motion yet, have you?

14           MR. SMEBERG:  No.  That's -- That's probably

15  coming today.

16           THE COURT:  Okay.  So, you'll have to have a

17  hearing on that next week?

18           MR. SMEBERG:  I would think next week would

19  be a good time to do that.

20           MS. O'NEIL:  Your Honor, I apologize.  This

21  is Holly O'Neil on behalf of TCA.

22       There has been no proposal for use of cash

23  collateral.  We will vehemently oppose the use of cash

24  collateral.

25           THE COURT:  Well, once they file a motion,

July 5, 2013,

Page 53

1    you can talk about that.  I guess --

2        That's not in this motion, right, just the --

3            MS. O'NEIL:  That is correct, your Honor.

4            THE COURT:  Okay.

5            MS. O'NEIL:  They've not asked for authority

6    to use cash collateral.

7        And, on behalf of my client, we certainly have

8    concerns that Mr. Merrill needs -- does not have a

9    clear understanding of what his fiduciary duties are

10   and what he should be asking the Court for authority

11   to do.

12           THE COURT:  Okay.  So, the twenty-three

13   would be enough for two weeks, but not enough for

14   three weeks, or two-and-a-half weeks?

15           MR. SMEBERG:  Yes, your Honor.

16           THE COURT:  Okay.  And you're going to still

17   file a motion to use cash collateral and try to get a

18   hearing next week on that, so that you can continue

19   using income as it comes in to pay for food and other

20   expenses?

21           MR. SMEBERG:  That would be the overall

22   goal, your Honor.

23           THE COURT:  Okay.  Ms. O'Neil, is this

24   objected to today, for the 23,000, or -- I'm not sure

25   I understand the position.  Is it "no" to everything,

July 5, 2013,

Page 54

1    or is it "maybe" to some things and "no" to others?

2              MS. O'NEIL:  Your Honor, on behalf of my

3    client, the answer is:  We object all the way around.

4         As the Court -- As we had provided in our

5    objection, and then attached, we have been in

6    foreclosure proceedings in Florida.  There's been no

7    contention, in conjunction with the Florida

8    litigation, and, in fact, we believe they have already

9    acceded to the validity/priority of our liens.

10        This company is woefully insolvent.  The -- This

11   is clearly an insider arrangement between the Debtor

12   and these two directors.  This was not negotiated at

13   arms-length.

14        Under no circumstances should the Debtor be given

15   authority to sign this credit agreement that is -- one

16   fiduciary has not even read, and doesn't even know the

17   terms of.

18        This is, we believe, just a contrived situation.

19   They knew when the payroll was coming due.  They knew

20   when -- they knew that they had failed to pay the

21   rents.  They knew were at a low point, and have

22   consistently been at a low point in cash at this time.

23        This is -- Under this management, this has,

24   effectively, been a hopeless situation, as it were.

25        But we want to foreclose on our collateral.  And

July 5, 2013,

Page 55

1    if that means the business shuts down, then so be it.

2    We'll deal with our -- what our collateral is.

3        I don't appreciate Mr. Smeberg making

4    representations on behalf of my client, who he has not

5    spoken with.  And this is a -- a dire situation that

6    is -- Going into bankruptcy was tactical.

7        If the shareholders want to put some more money

8    in and legitimately negotiate with my client for the

9    appropriate transition of the company, and allow them

10   to foreclose on the collateral, then that's

11   appropriate.  But they should not be, certainly, given

12   an opportunity to elevate claims, when you've got a

13   situation where, in all likelihood, my client's got a

14   large deficiency.

15       So, giving these insiders an elevated, even an

16   unsecured claim, over the legitimate claims of -- of

17   other unsecured creditors, very likely my client being

18   one of the larger, is inappropriate at this time,

19   considering the history of this proceeding -- I'm

20   sorry -- of this relationship in this company with its

21   creditors.

22       And so we -- Just to be crystal clear, we -- we

23   object all the way around.

24            THE COURT:  Okay.  Ms. Ratchford?

25            MS. RATCHFORD:  Nancy Ratchford, for the

July 5, 2013,

Page 56

1    U.S. Trustee.

2        Your Honor the U.S. Trustee objects to the Court

3    granting the motion to approve the DIP facility -- the

4    Debtor-In-Possession facility on the terms requested,

5    including the grant of an administrative expense claim

6    to insiders of the Debtor, at this point.  I do not

7    believe that the testimony before the Court has

8    allowed the Debtor to meet its burden of proof as to

9    adequate protection, or as to any ability to get

10   credit on other terms.  This is a -- as requested, is

11   what we have in front of us.

12       While I appreciate Mr. Smeberg's offer to pare it

13   down, that's not the request in front of the Court.

14       And it seems, to the U.S. Trustee, that this is

15   backwards.  The Debtor is asking for approval of a

16   $50,000 Debtor-In-Possession facility and the grant of

17   an administrative priority claim to insiders.  It's a

18   revolving facility.  It doesn't pay simply those

19   absolutely necessary expenses for the next two weeks.

20       If the Court is going to grant the request, the

21   U.S. Trustee would suggest to the Court that you

22   approve borrowing only to the extent of the amounts

23   that are absolutely necessary, which, based on the

24   testimony today, is the approximately $20,000 in

25   wages.

July 5, 2013,

Page 57

1        There is no request on-hand, and no request in

2    the pleadings, to pay food suppliers.  Those food

3    suppliers, while I understand they may be necessary,

4    have additional other claims, including potential

5    administrative expense claims, based on potential for

6    reclamation.

7        So, I don't know what the Court is actually

8    approving, if you were to approve it on these terms

9    requested.

10       I have no objection, on behalf of the U.S.

11   Trustee, to payment of prepetition wages or wages that

12   are due to employees, excluding insiders, officers,

13   directors and members of management.

14       I would ask, in connection with the wage motion,

15   that the Debtor be required to attach to the motion

16   some information as to employees that are being paid.

17   While that was provided to the U.S. Trustee this

18   morning, it's not part of the order.

19       And the Debtor should also be limited to the

20   priority amount under 507(b)(4), so that it may not

21   exceed at least $12,475 per employee.  And all

22   management, officers, directors and insiders should be

23   excluded.

24       None of the amounts on the document that the U.S.

25   Trustee received appear to exceed the priority amount.

July 5, 2013,

Page 58

1   The Court could authorize that, and if monies came in,

2   in the ordinary course of business, the Debtor should

3   most likely go back and negotiate cash collateral.

4        Alternatively, the Court could grant the motion

5   as to the Debtor-In-Possession facility, and alter the

6   terms of the facility.  And we would suggest to the

7   Court that you do so.

8        There's mixed testimony on the interest rate.

9   The note attached says 7 percent and 12 percent.  But,

10  frankly, all the other terms of the revolving credit

11  facility are, in the view of the U.S. Trustee,

12  Draconian, and restrict the Debtor, at an early stage

13  of the case, unnecessarily.  And there's been limited

14  or no testimony about adequate protection.

15       So, the U.S. Trustee objects to the grant of the

16  Debtor-In-Possession facility on the terms requested.

17       If the Court is going to approve it, we would

18  suggest that you alter and limit the terms, to make it

19  more appropriate, on short notice, with a case filed

20  on July 3rd, and hearings scheduled on the morning of

21  July 5th.

22       Thank you, your Honor.

23            THE COURT:  Okay.  What else, Mr. Smeberg?

24            MR. SMEBERG:  I think that's pretty much it,

25  your Honor.

July 5, 2013,

Page 59

1      And, once again, I don't disagree with the U.S.

2   Trustee on paring it down.  I do believe the Court has

3   the authority to pare down the agreement to something

4   that the Court believes is reasonable and proper.

5      I just want to note, once again, that the

6   shareholders are bringing up this money.  They already

7   just put $10,000 of money, which, at the end of the

8   day, whether it's a loan or equity, they're probably

9   not going to get back unless the company continues.

10      So, to ask them to get some type of priority for

11   this money that they're willing to put in now, to not

12   only save TCA's interest -- And I -- And I appreciate

13   their counsel's -- what they have proffered.  But the

14   reality is, by keeping the company operating, they're

15   protecting TCA's interests and the interests of the

16   other 94 percent of the shareholders.

17      So, with that said -- I will say it was

18   12 percent in the agreement.  There was a typo in

19   there, through the speed of trying to get it done.

20         THE COURT:  Well, the note's the same.  It

21   says 7 in -- in the text, and 12 in numerals.

22         MR. SMEBERG:  I understand that, your Honor.

23   And --

24         THE COURT:  So, is it 12 or 7?

25         MR. SMEBERG:  Twelve percent.  Twelve

July 5, 2013,

Page 60

1   percent was the amount agreed to.  Which, once again,

2   is far less than what TCA is getting on their note,

3   which was done outside of bankruptcy.  So, I believe

4   the 12 percent is fair, as well.

5        But if the Court finds that another interest rate

6   is reasonable, I can always go back to the lenders and

7   see -- and if the Court will agree, I can go back and

8   ask them and see if they'll -- Then it will be up to

9   them, whether they want to lend the money.

10            THE COURT:  Okay.  Well, let's do this.  As

11  I said, this is not my case, it's just Gargotta's

12  case, so we have to reset it to him for a final

13  hearing.  And the reset date we have is July 22nd, at

14  9:30.  That's a Monday.  So, that's past your actual

15  payroll date of the 20th.

16       So, what I'm going to do is sort of a contingent

17  order.

18       Number one, you can execute the revolving credit

19  agreement.  The interest rate of 12 is okay.  It's not

20  great, but it's okay.

21       I'll give them administrative priority for that

22  lending.

23       It will be $20,000 for salaries today, with the

24  understanding they're all within the priority limit.

25       They're all less than $12,000; correct?

July 5, 2013,

Page 61

1          MR. SMEBERG:  Yes, your Honor.

2          THE COURT:  Okay.  And we're not paying

3    Mr. Merrill, for example, or the executives.

4          MR. SMEBERG:  We will not pay any corporate

5    officers or managers or directors.

6          THE COURT:  Okay.  So, we're paying just the

7    people that make the pies and work in the restaurants,

8    and so forth.

9          Okay.  So, it's $20,000 authorized to be paid

10   today, out of the money that's lent, plus 3,000 for

11   the food supplies.

12         And if we come up to the 19th, which is a Friday,

13   and you need to make payroll and there has not been

14   any further order of the Court by Judge Gargotta or by

15   me at that point, then you can pay the 20,000 in

16   salary that's due on the 20th.

17         If Judge Gargotta makes some order between now

18   and then, then of course that will govern.

19         So, I'm just making the contingency that if

20   nothing happens between today and July the 22nd, the

21   payroll can be paid for the July the 20th payroll.

22         Now, the food that you are going to have to

23   obviously buy between now and the 22nd, you need to

24   file a motion to use cash collateral, and -- or come

25   up with some other source for that.

Federal Court Reporters of San Antonio, Inc.
210-340-6464

July 5, 2013,

Page 62

1      So, at this point, you're not authorized to use

2 cash collateral.  Obviously, TCA's claiming it as cash

3 collateral, your gross revenues, and your income, and

4 accounts receivable, and so forth.  So, you need to

5 not use it until you get permission from Judge

6 Gargotta, or from the lienholder, or both.

7      And, so, this does not cover food, other than

8 that one $3,000 payment.

9      And you're going to need, obviously, money for

10 rents, utilities, and all other kinds of expenses for

11 the business.  So, that's why you're going to need to

12 either come up with an alternate source of funding or

13 use cash collateral, but only with permission of the

14 Court.

15      So, we'll reset it.  This will be an interim

16 order.  We'll reset it for a final hearing for July

17 22nd at 9:30.  It will be in Courtroom Number 3, on

18 the fifth floor.

19      Any questions or concerns, Ms. Ratchford?

20      MS. RATCHFORD:  Your Honor, Nancy Ratchford,

21 for the U.S. Trustee.  Just one point of clarification

22 so I understand the Court's order.

23      Did you intend that the Debtor execute the

24 revolving credit agreement, which is what you said, or

25 simply the promissory note?  Because I think --

July 5, 2013,

Page 63

 1             THE COURT:  Do we need the revolving credit
 2   agreement?
 3             MR. SMEBERG:  I don't think so, your Honor.
 4   As long as I can put in the order they're going to get
 5   administrative priority, I think we can pitch --
 6             THE COURT:  Right.
 7             MR. SMEBERG:  -- the revolving agreement.
 8   We'll just do the note.
 9             THE COURT:  Yeah, let's just use the note.
10   And then, of course, you can't charge interest on
11   money that has not been advanced.  So, it's okay if
12   they do periodic advances, like today, 20,000, 3,000
13   next week, and then on the 19th, 20,000, if we don't
14   have any intervening order.  We don't need to advance
15   all the money today, and interest start accruing.  So,
16   as long as you understand you can't charge interest on
17   it until it's actually advanced, that's fine.  And I
18   don't think we need the agreement, the revolving
19   credit agreement.
20             MS. RATCHFORD:  Thank you, your Honor.
21   That's all I had.
22             THE COURT:  Okay.  Mr. Ochoa, or any
23   concerns, Ms. O'Neil, other than that?
24             MS. O'NEIL:  Thank you, your Honor.  I
25   appreciate your giving us an accommodation on short

July 5, 2013,

Page 64

1  notice.

2          THE COURT:  Okay.  Sorry to get you in here

3  so quick, but we just have to react to what people

4  file.

5          MS. O'NEIL:  No, I appreciate it.  Thank

6  you.

7          THE COURT:  All right.  You're going to do

8  the order, Mr. Smeberg?

9          MR. SMEBERG:  Yes, your Honor.  I'll do the

10  order.

11          THE COURT:  Okay.  Now, there were actually

12  two motions.  One was on the employees and one was on

13  the lending; right?

14          MR. SMEBERG:  Yes, your Honor.

15          THE COURT:  Okay.  So, if you'll do an order

16  on each one.  And, again, --

17          MS. O'NEIL:  And your Honor -- And your --

18          THE COURT:  -- reset the --

19          MS. O'NEIL:  I'm sorry, your Honor.

20          THE COURT:  I'm sorry?

21          MS. O'NEIL:  If we may just --

22          THE COURT:  Review them?

23          MS. O'NEIL:  If Mr. Smeberg will run the

24  order by us for review before --

25          THE COURT:  Yeah.

July 5, 2013,

Page 65

1            MS. O'NEIL:  -- before submission.

2            THE COURT:  Yeah.  And do you need that

3    signed today?

4            MR. SMEBERG:  If we need the order to pay

5    the employees, then I would say yes.  I can go over it

6    with Mr. Ochoa, here.  It's pretty short and simple.

7            THE COURT:  Okay.

8            MR. SMEBERG:  And, so, I've got a copy of

9    it.  I think we can probably, between us...  And I can

10   get on my computer and I can re-upload it.

11           THE COURT:  Okay.  All right.  That will be

12   fine.  We'll look for it early today, then.

13       And both motions are reset for final hearing on

14   the 22nd of July at 9:30.  Okay?

15           MS. O'NEIL:  Thank you.

16           THE COURT:  All right.  We'll be in recess.

17           COURTROOM DEPUTY:  All rise.

18           (Recess.)

19                 ************

20

21       I, Court approved transcriber, certify that the
     foregoing is a correct transcript from the official
     electronic sound recording of the proceedings in the
22   above-entitled matter.

23

     Signature of Approved Transcriber     Date
24

25   Darla Messina